PEOPLE v MILBOURN

Docket No. 80475. Argued May 3, 1988 (Calendar No. 2). Decided
    September 11, 1990.

Kevin M. Milbourn was convicted by a jury in the Eaton Circuit
    Court, Richard M. Shuster, J., of breaking and entering with
    intent to commit malicious destruction of property over $100.
    The court imposed the maximum possible sentence, in substan-
    tial departure from the sentencing guidelines. The Court of
    Appeals, BEASLEY, P.J., and R. B. BURNS and G. D. LOSTRACCO,
    JJ., affirmed in an unpublished opinion per curiam, finding
    that the sentence did not shock the Court's conscience (Docket
    No. 85990). The defendant appeals.

    In an opinion by Justice BRICKLEY, joined by Justices LEVIN,
    CAVANAGH, ARCHER, and GRIFFIN, the Supreme Court held:

    Sentences imposed by trial courts are subject to review by
    the appellate courts. The propriety of a given sentence should
    no longer turn on whether the sentence "shocks the con-
    science" of the appellate court as articulated in People v Coles,
    417 Mich 523 (1983), however. Rather, appellate review should
    apply the principle of proportionality, i.e., determine whether
    the sentence was proportionate to the seriousness of the matter
    for which punishment was imposed.

    1. A primary difficulty with the rule that a sentence may not
    be overturned on appeal unless the trial court has abused its
    discretion to the extent that it shocks the conscience of the
    appellate court is its subjectivity. In addition, it is evident that
    the "shock the conscience" test cannot effectively combat un-
    justified disparity.

    2. The most severe punishments are available for those who
    commit the most serious crimes and who have extensive crimi-
    nal records. In creating this sentencing scheme, the Legislature
    subscribed to the "principle of proportionality," according to
    which punishments are proportionate to the seriousness of the
    offense and the dangerousness of the offender. The Legislature
    then left to the judiciary, with regard to most crimes, the task

REFERENCES

Am Jur 2d, Criminal Law § 538.
See the Index to Annotations under Sentence and Punishment.

of determining the sentence to be imposed upon each offender within given bounds. Judicial sentencing discretion should be exercised, within the legislatively prescribed range, according to the same principle of proportionality that has guided the Legislature in its allocation of punishment over the full spectrum of criminal behavior. Thus, the legislative scheme is best served by requiring that individual sentences be proportionate to the seriousness of the matter for which they are imposed, taking into account the seriousness of the conduct and the offender's criminal history.

3. The legislative purpose in creating sentencing ranges, and thereby providing for discretion in sentencing, was to allow the principle of proportionality to be put into practice, not to accommodate subjective, philosophical differences among judges. The sentencing guidelines provide an invaluable tool for gauging the seriousness of a particular offense by a particular offender, as well as disparity among sentences, with respect to those felonies included within the guidelines. Representing the actual sentencing practices of the judiciary, the second edition is the best barometer of where on the continuum from the least to the most threatening circumstances a given case falls. Use is not mandatory, and departures are appropriate where the guidelines do not adequately account for legitimate factors considered at sentencing or where, in the judgment of the trial court, the recommended sentencing range is disproportionate, in either direction, to the seriousness of a crime.

4. Where a trial court has departed from the sentencing guidelines, an appellate court's first inquiry should be whether the case involves circumstances not adequately embodied within the variables used to score the guidelines. A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court of the possibility that the trial court has violated the principle of proportionality and thus abused its sentencing discretion. Even where some departure appears to be appropriate, the extent of the departure, rather than the departure itself, may embody a violation. Since the determinative inquiry is whether a given sentence offends the principle of proportionality, it is also possible for a sentence within the guidelines to represent an abuse of discretion.

5. The imposition of the maximum possible sentence upon the defendant by the trial court in this case clearly violated the principle of proportionality and therefore constituted an abuse of discretion in violation of the legislative intent to reserve the most severe sanctions for the most serious combinations of

offense and offender background, requiring remand for re-sentencing.

·6. This modification of the standard of appellate sentence review is to apply to currently pending appeals in which the issue of sentence length has been raised and preserved, currently pending first appeals in which the appellant's initial brief has not yet been filed, and appeals filed after September 11, 1990.

Sentence vacated and case remanded for resentencing.

Justice BOYLE, joined by Chief Justice RILEY, dissenting, stated that the Michigan Constitution gives the Legislature the authority to provide for indeterminate sentencing. Pursuant to that authority, it enacted statutes setting maximum punishments and gave authority to the trial courts to set minimum punishments. Indeterminate sentencing thus is a legislative delegation of constitutional authority to trial judges to tailor sentences to the particular offender and the particular offense within the legislatively prescribed range of punishment. It is based on the assumption that offender and offense are not fungible and that the trial judge is legislatively deemed uniquely qualified to evaluate the existential reality of offense, offender, and victim. The Supreme Court does not have the authority to amend statutes, nor can the authority be manufactured by taking the principle of proportionality between penalties for different crimes and converting it into authorization to internally restrict the legislatively delegated authority of a trial judge to determine sentences within the prescribed range of punishments.

Proportionality is a concept relevant to determining whether a given sentence is cruel or unusual punishment under the Eighth Amendment when compared to punishments for similar crimes imposed by other states or at common law. There is no principle of internal proportionality requiring all persons convicted of the same crime to be treated similarly. Nor does the exercise of discretion render a penalty unconstitutional where standards guide its exercise.

The Legislature has not authorized the Supreme Court to decide that sentences within a lawful range are unlawful. Rather, the grant of authority to the trial courts is an express statement of legislative intent that the trial judge is to make that decision. Even if it were assumed that the Supreme Court had the authority to reverse a sentence on the ground that a departure from the guidelines was an abuse of discretion, in this case it does not follow that the trial court's finding that the

defendant was dangerous was an abuse of discretion. The sentence was based on objective factors supporting an inference of dangerousness and thus the departure from the guidelines was neither arbitrary nor biased.

The exercise of discretion, by definition, means that different results may be reached on the basis of the same evidence. To hold a given penalty unlawful because an appellate court draws a different inference than the trial court from the same evidence is to deny discretion and replace discretionary sentences with the more nearly determinate sentences set forth in the guidelines.

The assumption that the sentencing patterns of judges establish a normatively correct sentence range has no valid statistical basis. Therefore, there is no basis on which to conclude that a substantial departure by a trial court from the sentencing guidelines establishes arbitrary exercise of sentencing discretion. The revision of the guidelines is an acknowledgment that the originals were not intended to be definitive.

The sentence in this case is unusual only because the guidelines are inadequate to evaluate a person, such as the defendant, who displays an unremitting pattern of criminal activity and a particularly malevolent purpose. To presume that it is arbitrary, despite evidence to support the trial court's conclusion, is an indictment of the sentencing judge and a vote of no confidence in the fairness of trial judges generally.

SENTENCES — STANDARD OF REVIEW — PROPORTIONALITY — SHOCK THE CONSCIENCE.

The determination of whether a particular sentence represents an abuse of discretion should no longer turn on whether the sentence shocks the conscience of the reviewing court; rather, a sentence constitutes an abuse of discretion if the sentence violates the principle of proportionality, according to which sentences must be proportionate to the seriousness of the matter for which punishment was imposed.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *G. Michael Hocking,* Prosecuting Attorney, and *William M. Worden,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *P. E. Bennett*) for the defendant.

BRICKLEY, J.

## I. INTRODUCTION

### A

Before us today stands a defendant who alleges that the trial court abused its discretion by imposing an excessively severe sentence. Defendant Milbourn was convicted of breaking and entering a residence with the intent to maliciously destroy property worth over $100.[1] Mr. Milbourn had lived in the residence together with his girl friend, the complainant, until the relationship soured. Shortly after the breakup, Mr. Milbourn committed several hostile acts in an eight-day period. The acts for which Mr. Milbourn's ten- to fifteen-year sentence was imposed consisted of breaking into his former apartment when no one was home and destroying property belonging to the complainant.

In order to decide whether Mr. Milbourn's claim that his sentence embodies an abuse of the trial judge's sentencing discretion is justified, we find it necessary to reëxamine the meaning of the term "abuse of discretion" in the sentencing context.

### B

Central to our recent and unanimous decision in *People v Coles,* 417 Mich 523, 535; 339 NW2d 440 (1983), was our holding that sentencing decisions, no less than the myriad other discretionary judicial actions, should be subject to review by our state's appellate courts.

We find no sound reason for interpreting the applicable constitutional and statutory provisions as carving out an exception to the right of appeal regarding sentencing matters. None of those rele-

[1] MCL 750.110; MSA 28.305.

vant provisions limit the particular issues subject to appellate review. We therefore conclude that the foregoing constitutional and statutory authority vest appellate courts with the jurisdiction to review all sentencing issues.

We continue to believe in the correctness of the central proposition set forth above. We conclude, however, that the mechanism we established in *Coles* for determining whether a particular sentence represents an abuse of discretion is beset with difficulties. Thus, we are persuaded that the propriety of a given exercise of sentencing discretion should no longer turn on whether the sentence "shocks the conscience of the appellate court." *Id.,* p 550.

Our preëminent requirement in formulating an alternative is to respect the purpose the Legislature of our state has manifested with regard to sentencing. The Legislature in establishing differing sentence ranges for different offenses across the spectrum of criminal behavior has clearly expressed its value judgments concerning the relative seriousness and severity of individual criminal offenses. This statutory sentencing scheme embodies the "principle of proportionality" according to which sentences are proportionate to the seriousness of the matter for which punishment is imposed. In our judgment, it is appropriate—if not unavoidable—to conclude that, with regard to the judicial selection of an individual sentence within the statutory minimum and maximum for a given offense, the Legislature similarly intended more serious commissions of a given crime by persons with a history of criminal behavior to receive harsher sentences than relatively less serious breaches of the same penal statute by first-time offenders. We believe that the Legislature's pur-

pose is best served by requiring judicial sentencing discretion to be exercised according to the same principle of proportionality that has guided the Legislature in its allocation of punishment over the entire spectrum of criminal behavior. Accordingly, a given sentence can be said to constitute an abuse of discretion if that sentence violates the principle of proportionality, which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.

This rule is superior in several ways to the "shock the conscience" test in implementing our decision in *Coles* permitting appellate courts to provide relief where there has been an abuse of discretion by the trial court. Most importantly, the proportionality test is better tailored to and in keeping with the sentencing scheme adopted by the Legislature. In addition, the proportionality standard is preferable because it is far less subjective than the "shock the conscience" inquiry. Finally, it is our hope and belief that the proportionality test will have the additional, incidental effect of fostering "sentencing equity," i.e., that it will provide better protection against unjustified sentence disparity between similarly situated offenders,[2] a phenomenon we condemned in *Coles* and which has been justly held up to criticism of the most vehement sort.[3]

C

Section II of this opinion sets forth the facts and

---

[2] For purposes of this opinion, sentence "disparity" and "equity" refer to the relationship of sentences of similarly situated offenders, whereas "proportionate" and "disproportionate" refer to the relationship of an individual sentence to the seriousness of the matter for which it was imposed.

[3] See Nagel, *Structuring sentencing discretion: The new federal sentencing guidelines,* 80 J Crim L & Criminology 883 (1990), and sources cited therein.

procedural history of the present case. Section III contains a discussion of *Coles,* followed by a critical evaluation and rejection of the "shock the conscience" test. Section IV discusses the principle of proportionality. Section V explores the abuse of discretion standard in light of the principle of proportionality and the sentencing guidelines. Section VI addresses the dissent's criticisms of our decision, focusing in particular on the dissent's contention that the trial judge should enjoy unfettered discretion in imposing sentencing. Section VII applies the rule to the sentence imposed on Mr. Milbourn and concludes that this sentence violates the principle of proportionality and therefore constitutes an abuse of sentencing discretion. Section VIII describes the applicability of this decision to other cases.

## II. FACTS AND PROCEDURAL HISTORY

### A

On October 22, 1984, two years after they had begun dating, the defendant and the complainant moved into an apartment with the lease in the name of the complainant. They lived there together, in a common household, until December 2, 1984. The defendant moved out because he and the complainant "broke up." Each reports blameworthy conduct on the part of the other, leading to the breakdown of the relationship.

The complainant testified that the relationship was clearly finished by the time of the events that gave rise to this prosecution. The defendant seems to have viewed the relationship as being in a "cooling-off" period, during which he was temporarily living apart from the complainant. The

complainant testified that she had mentioned such a cooling-off period to the defendant and had suggested that they might move back together again.

After the defendant's belongings were removed from the apartment, complainant changed the locks on December 13. She next saw the defendant on December 18, when he came to her place of employment. He handed her a greeting card and spoke briefly with her. When she said she did not wish to speak further, the defendant left, telling the complainant as he went, "You've had it."

She saw him again, after midnight, when she left work. The defendant approached her and said, "Don't call the police on me." The complainant did not understand this request. When she returned to her apartment, she found considerable damage. As described by the complainant and by a police officer, the scene included damage to clothes, a lamp, a television set, the walls, the furniture, bedding, drapes, and the phone cord. An appraiser who later saw much of the damage estimated that $330 worth of furniture had been damaged.

The defendant testified at trial of the resulting charge of breaking and entering that he had been drinking that evening and that he went to the apartment to retrieve his remaining belongings. (The complainant testified, however, that Mr. Milbourn's property had already been removed.) Mr. Milbourn said that when he discovered, to his surprise, that the locks had been changed, he cut a screen with a rock, slid open an unlocked window, and entered the apartment. Asked whether he had caused the damage, he said he did not remember doing such acts.

In addition to the prosecution for breaking and entering that gives rise to this appeal, two other criminal charges were lodged against the defen-

dant. Each resulted from conduct arising out of the relationship between the defendant and the complainant. One was a felonious assault complaint filed after a confrontation between the defendant and a male friend of the complainant. This charge was later dismissed.

The defendant also had a confrontation with the complainant on the evening of January 3, 1985. He broke a window of her car and flattened a tire. It is disputed whether he reached into the car and grabbed the complainant. For this, the defendant pled guilty of attempted malicious destruction of property over $100.[4] The defendant made numerous attempts to contact the complainant following these events, and he testified at trial that he still loved her.

There was also testimony of threats made by the defendant against the complainant, orally, in writing, and by gesture. The defendant generally denied these threats.[5]

When he committed the offense that gives rise to this appeal, the defendant had no prior criminal record.[6]

B

At the conclusion of a two-day jury trial, the defendant was convicted, as charged, of breaking and entering an occupied dwelling with the intent

[4] Mr. Milbourn was sentenced by Judge Kallman in the Ingham Circuit Court to one year in the county jail as a result of this plea.

[5] We find nothing in the record to support the suggestion in the dissenting opinion that the defendant had a "homicidal bent against the complainant" (*post,* p 686), or that it was "sheer fortuity" that the victim was not killed by the defendant (*id.*).

[6] At the time he was sentenced for this offense, he had pled guilty of attempted malicious destruction of property, and was awaiting sentencing.

to commit malicious destruction of property worth
more than $100.[7]

Although the sentencing guidelines recom-
mended a minimum sentence between twelve and
thirty months in prison,[8] the trial court imposed
the maximum possible sentence: a minimum term
of ten years. The sentencing judge explained the
departure on the sentencing information report[9]
and also explained on the record why he believed
it necessary to depart from the recommendation
found in the guidelines:

> All right, thank you, Mr. Milbourn.
> The Court has listened to the remarks of Coun-
> sel, as well as the remarks of Mr. Milbourn. And
> prior to coming to Court, I reviewed it all, all of
> my file notes, because I was the presiding Judge on
> the trial of this matter. And I need not reflect
> upon some of the other items in the pre-sentence
> report that [defense counsel] objects to. I can turn
> to my own recollections from the trial itself.
> The problem here is, we have a man that is a
> very sensitive young man, I believe in his own
> way, a very caring young man. I don't really
> quarrel with the remarks that [defense counsel]
> has made, except for the result that he asked. And
> the problem that has occurred here, as I have seen
> it, is that this young man has literally fits of rage
> with which he—not he or anyone else knows what
> the result might [be]. And it seems to me that we
> have seen the manner in which he went into the
> dwelling, then conducted himself in the destruc-

[7] MCL 750.110; MSA 28.305.

[8] This case fell into the A-III cell of the 180-month burglary grid.
Under the second edition of the guidelines, Milbourn would appar-
ently fall in cell B-III of the 180-month burglary grid. The recom-
mended range in that cell is zero to eighteen months.

[9]   [The defendant] has a violent temper and goes into fits of
rage. [The defendant] broke into [his] former girlfriend's apart-
ment and cut up and destroyed her belongings. When in a rage,
[the defendant] is very dangerous.

tion of items, cut them up and destroyed the belongings in a violent manner and then, perhaps honestly, professed a total lack of recall of that conduct. Other testimony was presented about the violent rages of temper. Indeed, there was even testimony of violent threats.

This Court has to assume that the Corrections Department and Parole Board will do its job properly. The Court feels that this young man needs protective custodial care during which that he would receive mental health counseling. And then we'll assume that the Corrections Department will, themselves, have to make decisions as to whether or not they believe that he can return to society. That's not the function of this Court. The function of this Court is to protect society from someone who at this point in in [sic] time constitutes, in my opinion, an extreme danger to society.

It is the sentence of this Court that Kevin Michael Milbourn be sentenced to the maximum period provided by law, which is a minimum of 10 years and a maximum of 15 years in prison. He shall receive credit as provided by law for the 135 days which he has spent in custody.

In arriving at this sentence, I've considered the following factors: One, the deterrence in the future of any further criminal behavior by you.

Two, and this is a very very important item to this Court, the protection of society from you, because of your criminal behavior. And that factor has to be a paramount factor.

Three, we have a sincere hope for your rehabilitation. We don't know if it's possible, we would hope that it is. At this juncture, we don't know. That answer is going to be left to others.

Four, the requirement that there can be no safe society without law and there can be no effective law without punishment for its violation.

Now, as has been pointed out, this does not stay within the so-called Michigan guidelines, and I have filled this form out, and the form that says "Actual sentence, I've said, 10 to 15 years." But as to "specific conditions" I've said, receive mental

health counseling. And then for the reason for departure, I've said this, Defendant has a violent temper and goes into fits of rage. Defendant broke into former girlfriend's apartment and cut up and destroyed her belongings. When in a rage, the Defendant is very dangerous.

The Court of Appeals affirmed the defendant's conviction and sentence.[10] As to the propriety of the sentence in this case, the Court of Appeals said simply:

Lastly, the trial judge stated his reasons for departing from the sentencing guidelines and the sentence does not shock our conscience.

This Court then granted leave to appeal.[11]

### III. *PEOPLE v COLES*

In *Coles*, we explained in great detail the basis of our determination that a sentencing decision, no less than any other discretionary judicial act, should be subject to appellate review. We outlined the history of sentence review in Michigan, surveyed the practices in other jurisdictions, and noted the views of legal commentators.[12] In addition, we discussed and denounced the presence of

---

[10] *People v Milbourn,* unpublished opinion per curiam of the Court of Appeals, decided February 24, 1987 (Docket No. 85990). Milbourn had earlier moved the Court of Appeals for a remand to the trial court, for the purpose of conducting an evidentiary hearing as to the sentencing practices of the judge who imposed the sentence in this case. This motion was denied by the Court of Appeals.

[11] We granted leave to appeal "[l]imited to the issue whether the 10- to 15-year sentence here, which was four times the high range of the Sentencing Guidelines, was an abuse of discretion or shocking to the conscience under *People v Coles,* 417 Mich 523 (1983)." *People v Milbourn,* 429 Mich 858 (1987).

[12] Further, we weighed heavily the conclusions of this Court's Committee on Sentence Review, chaired by Judge DANIEL F. WALSH of the Court of Appeals.

unjustified sentence disparities. Our conclusion
was that Michigan should join the great majority
of American jurisdictions in which sentences are
subject to appellate review.[13]

In *Coles, supra,* p 550, we determined that sen-
tence review should be expanded. Specifically, we
said that an appellate court is to "review a trial
court's exercise of discretion in sentencing, but
may afford relief to the defendant only if the
appellate court finds that the trial court, in impos-
ing the sentence, abused its discretion to the ex-
tent that it shocks the conscience of the appellate
court." Having articulated this standard, we re-
marked that the "scope of review may subse-
quently evolve, by means of case law or statutory
enactment, into something more definite or even
different from that which we announce today." *Id.,*
p 549.

Thousands of criminal cases have reached the
appellate courts since *Coles* was decided on Octo-
ber 24, 1983. The Court of Appeals has published
several opinions indicating that its conscience was
shocked, and there exists also a handful of pub-
lished decisions in which panels have divided on
the issue whether the defendant was entitled to
resentencing under *Coles.*[14]

On a number of occasions, judges of the Court of
Appeals have requested in their opinions that this
Court provide further guidance regarding the
meaning of the phrase "abused its discretion to
the extent that it shocks the conscience of the
appellate court." Judges of that Court have also

[13] This conclusion accords with Standard 20-1.1 of the 4 American
Bar Association's Standards for Criminal Justice (2d ed), except that
Standard 20-1.1(d) states that "[t]he prosecution should not be permit-
ted to appeal a sentence on the grounds that it is too lenient." This
Court has placed no such limitation upon the prosecutor's right to
appeal a sentence.

[14] There are roughly a dozen cases in each category.

inquired how we intend the sentencing guidelines to be employed in appellate review. *People v Rutherford*, 140 Mich App 272, 278-282; 364 NW2d 305 (1985) (opinion of SHEPHERD, J.), and *People v Line*, 145 Mich App 567, 573-579; 378 NW2d 781 (1985) (opinion of J. C. RAVITZ, J.), lv den 425 Mich 857 (1986).

We remain persuaded that the fundamental aspect of *Coles*—that an appellate court must review the trial court's exercise of the sentencing discretion entrusted to it by the Legislature—is correct. We are now prepared to recognize, however, that the standard we developed to carry out the task of appellate sentence review—the "shock the conscience" test—is deficient in important respects. We turn now to a discussion of these shortcomings.

A

A primary difficulty with the rule that a sentence may not be overturned on appeal unless the trial court has "abused its discretion to the extent that it shocks the conscience of the appellate court" is its subjectivity. In a discussion of remittitur in a personal injury case, we recently held:

The "shock the conscience" inquiry is an inappropriate consideration since it merely involves an expression of the trial judge's personal values and subjective beliefs and in no way relates to the actual conduct of the trial. As we have learned in reviewing sentencing issues under *People v Coles,* 417 Mich 523; 339 NW2d 440 (1983), what shocks the conscience of one judge does not necessarily shock the conscience of another. . . . Because we view [the "shock the conscience"] inquiry to be one of complete subjectivity, we hold that it is not to be undertaken in any analysis relating to remitti-

tur. [*Palenkas v Beaumont Hosp,* 432 Mich 527, 532-533; 443 NW2d 354 (1989).]

While a measure of subjectivity in judicial decisions is unavoidable due to the differing personal backgrounds, experiences, and viewpoints of different members of the bench, a standard which is itself "one of complete subjectivity" has no more place on the appellate bench than in the trial court. A rule which contains no directives to the judges who must apply it—other than to encourage the rendering of decisions in accordance with personal value judgments—is a "rule" only in the weakest sense.

B

A related and important problem inherent in the "shock the conscience" standard concerns disparity in sentencing. We observed in *Coles, supra,* p 546, that

disparity in sentences which results from considerations such as the race or economic status of a defendant or *the personal bias and attitude of an individual sentencing judge* is unjustified and impermissible. Unjustified disparities promote disrespect for the criminal justice system and resentment among prisoners, thus impairing their morale and motivation for rehabilitation. We conclude that such sentences should be subject to appellate review and relief when warranted. [Emphasis added.]

The public's faith in the just and fair administration of justice is also shaken by the imposition of unjustifiable and unexplained sentence disparity. Just as the routine award of high grades demeans academic value, the routine imposition of maximum sentences would send a garbled message

of society's views on the relative blameworthiness of various commissions of a given crime to the public as well as to the ultimate consumer of judicial sentencing behavior—the convicted offender.

Professor and Commissioner of the United States Sentencing Commission Ilene H. Nagel, in an informative article on the genesis and the current state of federal sentencing policy under the Sentencing Reform Act, observed:

> The purpose of the Act was to attack the tripartite problems of disparity, dishonesty, and for some offenses, excessive leniency, all seemingly made worse by a system of near unfettered judicial discretion.
>
> For decades, empirical studies repeatedly showed that similarly situated offenders were sentenced, and did actually serve, widely disparate sentences. Furthermore, the disparity found to characterize federal sentencing was thought to sometimes mask, and be correlated with, discrimination on the basis of a defendant's race, sex, or social class. For a system claiming equal justice for all, disparity was an inexplicable yet constant source of embarrassment. [Nagel, *Structuring sentencing discretion: The new federal sentencing guidelines,* 80 J Crim L & Criminology 883-884 (1990).]

Indeed, concern over the effect of unwarranted sentence disparities on the part of the public is not a novel one, as is made clear by this vivid passage penned by an eminent commentator almost two centuries ago:

> Not a great many years ago, upon the Norfolk circuit, a larceny was committed by two men in a poultry yard, but only one of them was apprehended; the other having escaped into a distant

part of the country, had eluded all pursuit. At the next assizes the apprehended thief was tried and convicted; but Lord Loughborough, before whom he was tried, thinking the offence a very slight one, sentenced him only to a few months imprisonment. The news of this sentence having reached the accomplice in his retreat, he immediately returned, and surrendered himself to take his trial at the next assizes. The next assizes came; but, unfortunately for the prisoner, it was a different judge who presided; and still more unfortunately, Mr. Justice Gould, who happened to be the judge, though of a very mild and indulgent disposition, had observed, or thought he had observed, that men who set out with stealing fowls, generally end by committing the most atrocious crimes; and building a sort of system upon this observation, had made it a rule to punish this offence with very great severity, and he accordingly, to the great astonishment of this unhappy man, sentenced him to be transported. While one was taking his departure for Botany Bay, the term of the other's imprisonment had expired; and what must have been the notions which that little public, who witnessed and compared these two examples, formed of our system of criminal jurisprudence? [Romilly, Observations on the Criminal Law of England (2d ed) 18-19 (1811).]

It is evident that the "shock the conscience" test cannot effectively combat unjustified disparity. An "abuse of discretion" standard by itself can be construed so narrowly as to avoid dealing with disparity altogether.[15] If the class of cases in which

[15] See, e.g., *Spalding v Spalding*, 355 Mich 382, 384-385; 94 NW2d 810 (1959). In that case, the appellant sought an increase in child support from $35 per week to $50 per week. The judge granted an increase to $42.50 per week, and the appellant appealed to this Court, seeking the full amount requested. In denying relief, the *Spalding* Court articulated an extremely deferential definition of the term "abuse of discretion":

The term discretion itself involves the idea of choice, of an

the trial court can be said to have abused its discretion is pruned to include only those cases in which the appellate conscience is shocked, then relief simply will not be available in the great majority of cases involving unjustified disparity, since the presence of such disparity does not depend on circumstances which "shock the consciences" of a majority of a given panel of the Court of Appeals.

C

A number of appellate opinions have been published in our state since *Coles* was decided expressing frustration with the current state of sentence review, perhaps the most forceful of which was issued by Court of Appeals Judge SHEPHERD, concurring in *Rutherford, supra,* pp 279-282:

> My concern is that the present framework of sentence review provides no surer means of curing such abuses than existed prior to *Coles, supra.* Reliance upon the "conscience of the appellate court" will not result in justice evenly applied across the state, for we, like members of society generally, vary in what our consciences dictate.
>
> * * *
>
> [I]f there is a lack of any direct connection between the guidelines and *Coles* review, we are left with insufficient means to evaluate the relative excessiveness of the sentences before us. If we cannot rely upon the guidelines to help form a

exercise of the will, of a determination made between competing considerations. In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. So tested, we perceive no error in the proceedings below nor in the determination made. [*Id.,* pp 384-385.]

more educated appellate "conscience," we are left
again in a realm of subjectivity, "with confidence
in the criminal justice system correspondingly
diminished." *Coles,* p 542.

. . . *Coles* and the guidelines were designed to
minimize the impact of a judge's personal con-
science and to create a more rational and uniform
basis for sentencing. We should not labor under
the illusion that this has been accomplished. In
fact, it will never be accomplished until the Court
of Appeals has been given standards to apply
which remove sentence review from the same
nebulous and arbitrary criteria which still exist in
the trial courts. It is one thing to say that trial
and appellate courts must be given a degree of
flexibility so that each case may be adapted to its
circumstances; it is quite another to base that
flexibility upon a foundation no more solid than
the personal consciences of individual judges.

I respectfully invite the Supreme Court to grant
leave in the present case and help us to resolve
these fundamental difficulties in sentence re-
view.[16]

Having concluded that the "shock the con-
science" standard is inadequate, we must articu-
late a rule which improves upon that standard
before we cast it aside. A new rule must be less
subjective than the old rule, and it should offer
more effective protection against unjustified sen-
tence disparity. More importantly, we believe that
because the responsibility for defining our criminal
laws is rooted firmly in legislative territory, the
rule must comport with the intent of the Legisla-
ture to the extent that a legislative intent is
discernible regarding individual sentencing deci-
sions. We next consider the legislative sentencing

[16] See also *Line, supra* (concurring opinion of RAVITZ, J.); *People v
Landis,* 139 Mich App 120; 361 NW2d 748 (1984) (dissenting opinion
of KELLY, J.).

scheme which forms the foundation of the standard we adopt today.

## IV. PROPORTIONALITY

When the legislative scheme for criminal sentencing is viewed across the spectrum of crimes from misdemeanor traffic violations to cold-blooded murders, two aspects are immediately clear. First, the Legislature has endeavored to provide the most severe punishments for those who commit the most serious crimes. The crime of murder, for example, is punishable by a longer term than is the lesser included crime of assault. Second, offenders with prior criminal records are likewise subject to harsher punishment than those with no prior convictions, as reflected in the general and specific habitual offender provisions of the penal statutes. These two elements combine to form what might be called the "principle of proportionality." As stated over three quarters of a century ago by the United States Supreme Court, "[I]t is a precept of justice that punishment for the crime should be graduated and proportioned to the offense." *Weems v United States,* 217 US 349, 367; 30 S Ct 544; 54 L Ed 793 (1910). In more recent times, the Court has found defects of constitutional magnitude in sentences which are disproportionate to the offense. For example, in *Coker v Georgia,* 433 US 584, 592, n 4; 97 S Ct 2861; 53 L Ed 2d 982 (1977), the Court stated:

Because the death sentence is a disproportionate punishment for rape, it is cruel and unusual punishment within the meaning of the Eighth Amendment even though it may measurably serve the legitimate ends of punishment and therefore is not invalid for its failure to do so.

Turning from the legislative felony sentencing scheme in general to the prescribed punishment for individual felonies, we note that the Legislature has, with only a few exceptions, provided a range of punishment for each felony. Because the Legislature in addressing criminal punishment in general has subscribed to the principle of proportionality and because the commission of a given crime by a given offender may also vary considerably in seriousness, we believe it reasonable to conclude that the Legislature, in setting a range of allowable punishments for a single felony, intended persons whose conduct is more harmful and who have more serious prior criminal records to receive greater punishment than those whose criminal behavior and prior record are less threatening to society.

The Legislature then left to the judiciary, with regard to most crimes, the task of determining the sentence to be imposed upon each offender within given bounds. We believe that judicial sentencing discretion should be exercised, within the legislatively prescribed range, according to the same principle of proportionality that guides the Legislature in its allocation of punishment over the full spectrum of criminal behavior. Thus, a judge helps to fulfill the overall legislative scheme of criminal punishment by taking care to assure that the sentences imposed across the discretionary range are proportionate to the seriousness of the matters that come before the court for sentencing. In making this assessment, the judge, of course, must take into account the nature of the offense and the background of the offender.[17]

To reiterate, we believe that the purpose of the

[17] Addressing questions not before us today, Justice BRENNAN explained that the Legislature "leaves the setting of the minimum sentence to the court for the very purpose of creating latitude so as to

Legislature in creating sentence ranges and, thereby, providing for discretion in sentencing was to allow the principle of proportionality to be put into practice. We are thus persuaded that the purpose of discretionary[18] sentencing was not to

relieve from the maximum penalty those defendants whose conduct contained some circumstances of mitigation, or at least no circumstances of aggravation." *People v Sinclair,* 387 Mich 91, 151; 194 NW2d 878 (1972).

[18] Throughout the dissenting opinion, the terms "indeterminate" sentencing and "discretionary" sentencing are used interchangeably. The dissent is clearly in error in suggesting that today's opinion will have any effect on indeterminate sentencing.

An *indeterminate* sentence is one whose precise duration is unknown at the time of sentencing. See, e.g., *People v Tanner,* 387 Mich 683, 690; 199 NW2d 202 (1972) ("[A] sentence with too short an interval between minimum and maximum is not indeterminate"). The exact amount of time to be served within the range set by the trial judge is determined according to postsentencing factors by persons other than the judge. The Legislature has determined that indeterminate sentencing shall be the rule in Michigan, and this Court carried out that intention in *Tanner* by holding, in harmony with ABA standards, *id.,* p 689, that the minimum term of an indeterminate sentence must be no more than two-thirds of the legislative maximum for that crime. Therefore, sentences meted out before and after today's decision have been and will remain indeterminate in accordance with *Tanner.*

*Discretionary* sentencing, of course, is a different matter. Under that concept, unless otherwise specified, the sentencing judge has discretion in selecting a minimum sentence between the legislative minimum and, in accordance with *Tanner,* two-thirds of the maximum time prescribed by the Legislature. (*Tanner,* by enforcing the legislative scheme of indeterminate sentencing, incidentally limited the sentencing discretion of the trial judges.) In Michigan, most sentences are imposed under the discretionary/indeterminate scheme, according to which a sentencing judge can select a range of time a person must serve but not the precise length of the sentence. There are also nondiscretionary/indeterminate sentences, in which the judge has no discretion to depart from a specific predetermined range (some drug crimes have employed this scheme); discretionary/determinate sentences, in which the judge can pick the exact period of time that the convicted person must serve (misdemeanors fall into this category); and nondiscretionary/determinate sentences, in which the statute provides for the specific time to be served, as is prescribed for first-degree murder (mandatory life) and possession of a firearm during the commission of a felony (two years). We can only assume and will presume that, in the sense of the above definitions and classifications, the dissent is leveling its criticism not at the determinate/indeterminate facet of our sentencing scheme, but at the interference with its preference for absolute discretion.

accommodate subjective, philosophical differences among judges.[19] In the course of reviewing thousands of sentences since our decision in *Coles,* we have observed that different sentencing judges often subscribe to markedly different sentencing philosophies. For example, some judges may feel that any commission of a certain felony, even though the facts surrounding a particular criminal episode clearly do not justify worst-case treatment, should be answered with the maximum possible sentence. Much of our discussion in § II regarding subjectivity and unjustified disparity is equally applicable in this context. With regard to the principle of proportionality, it is our judgment that the imposition of the maximum possible sentence in the face of compelling mitigating circumstances would run against this principle and the legislative scheme.[20] Such a sentence would represent an abdication—and therefore an abuse—of discretion.[21] The trial court appropriately exercises the discretion left to it by the Legislature *not* by

Perhaps the most misleading misuses of terms by the dissent are the inaccurate suggestions that "indeterminate sentencing is a legislative delegation of constitutional authority to *trial judges* to tailor their sentences to the particular offender and the particular offense" (*post,* pp 680-681, emphasis added); and that it is possible to "replace discretionary sentences with the more nearly determinate sentences set forth in the grids" (*post,* p 687). Nothing within the present opinion is intended to or can possibly be expected to affect indeterminate sentencing in Michigan.

[19] See *Coles, supra,* p 546 ("[D]isparity in sentences which results from . . . the personal bias and attitude of an individual sentencing judge is unjustified and impermissible").

[20] Generally, the maximum possible sentence a trial judge may impose under our indeterminate sentencing scheme is one whose minimum term is two-thirds of the statutory maximum. See the discussion of *Tanner,* n 18 *supra.*

[21] See Levin, *Toward a more enlightened sentencing procedure,* 45 Neb L R 499 (1966) ("[W]e are attempting to eliminate the disparities in the sentences meted out by different judges . . . . We strive not to achieve uniform sentences but to acquire a uniform philosophy which includes the ingredients that lead to a sentence—one in keeping with enlightened social and legal policy").

applying its own philosophy of sentencing, but by determining where, on the continuum from the least to the most serious situations, an individual case falls and by sentencing the offender in accordance with this determination.

### V. PROPORTIONALITY AND APPELLATE REVIEW OF SENTENCES

#### A

Where a given case does not present a combination of circumstances placing the offender in either the most serious or least threatening class with respect to the particular crime, then the trial court is not justified in imposing the maximum or minimum penalty, respectively.[22] Accordingly, if the maximum or minimum penalty is unjustifiably imposed in this regard, contrary to the legislative scheme, the reviewing court must vacate the sentence and remand the case to the trial court for resentencing. The discretion conferred by the Legislature does not extend to exercises thereof which violate legislative intent; such exercises are, therefore, an abuse of discretion.

#### B

To be sure, the determination whether a sentence is so disproportionate to the seriousness of the circumstances of the crime as to require resentencing becomes considerably more difficult where the sentence does not represent the minimum or maximum allowable for a given crime.[23] Moreover, this difficulty may be compounded where the Legislature has set no minimum or has prescribed a maximum of a lengthy term of years or life.

[22] See n 20.
[23] See n 20.

Fortunately, since the publication of *Coles* in 1983, an invaluable tool for gauging the seriousness of a particular offense by a particular offender, as well as the disparity in sentencing between courtrooms, has been developed. In 1984 and 1985, we issued administrative orders requiring judges of this state to use the first edition of the Michigan Sentencing Guidelines. Administrative Order No. 1984-1, 418 Mich lxxx (1984); Administrative Order No. 1985-2, 420 Mich lxii (1985). As explained in McComb, *An overview of the second edition of the Michigan Sentencing Guidelines,* 67 Mich B J 863, 864 (1988),

> Since that time, the guidelines have remained in use statewide. The guidelines staff has assembled a data base of about 70,000 cases, and the Supreme Court and the Court of Appeals have begun to develop a body of case law on issues related to the guidelines (e.g., *People v Walker,* 428 Mich 261; 407 NW2d 367 [1987], *People v Broden,* 428 Mich 343; 408 NW2d 789 [1987], and *People v Fleming,* 428 Mich 408; 410 NW2d 266 [1987]). Since the guidelines took effect, the overall compliance rate has been in the vicinity of 80%. In addition, Michigan has seen the elimination of statistically significant racial disparity in sentencing in all of the nine crime groups.

> The SGAC has continued throughout the years to work on improving the guidelines. It has had the benefit of detailed statistical analyses of the committee's substantial data base. The judges' departure reasons have also been considered. Informal communication from bench and bar have also brought to the committee's attention areas in which improvements are needed.

> *       *       *

It became apparent that the point values for the PRVs and OVs, the $3 \times 6$ grid structure, and the recommended sentences were not consistent with current sentencing practice or with each other (or both). In any

case, there were many instances in which the offenders in a given grid cell were, in fact, not similar in terms of the factors most salient to the sentence. This, in turn, meant that no set of recommended ranges was likely to ensure compliance.

To rectify these problems, the SGAC began re-examining the extent to which the sentencing guidelines scoring system comported with actual judicial sentencing behavior. The conclusion reached by the SGAC and State Court Administrative Office staff was that the guidelines needed to better capture the reasoning process of the sentencing judges. Sparing the intermediate steps, the result of several years of work by the SGAC can be summarized as follows: the scoring system, grid configuration, and recommended sentence ranges have been revised so that they are both similar to the main currents of judicial decision-making and consistent with one another. *As such, the second edition distinguishes clearly between factors of greater importance and factors that are less significant, thereby providing a firm foundation for the location of classes of offenders who are indeed similarly situated.*

The guidelines represent the actual sentencing practices of the judiciary, and we believe that the second edition of the sentencing guidelines is the best "barometer" of where on the continuum from the least to the most threatening circumstances a given case falls.

Nevertheless, because our sentencing guidelines do not have a legislative mandate,[24] we are not

[24] In some other states, a sentencing judge may not depart from the guidelines unless the judge has identified "clear and convincing" or "substantial and compelling" reasons. Florida Rules of Criminal Procedure, Rule 3.701(d)(11); Minnesota Sentencing Guidelines and Commentary, Statement of Purpose and Principles, ¶ 4; Wash Rev Code Ann, § 9.94A.120(2).

There are also a number of states that permit a judge to depart from a presumptive sentence if there are aggravating and mitigating circumstances. Higher standards are imposed by some of these stat-

prepared to *require* adherence to the guidelines. We note that departures are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing. For example, as the dissent points out, a sentencing judge could legitimately depart from the guidelines when confronted by the unlikely prospect of a one hundred-time repeat offender, since the guidelines do not take such extensive criminal records into account. In addition, we emphasize that the guidelines should continue to reflect actual sentencing practice. To require strict adherence to the guidelines would effectively prevent their evolution, and, for this reason, trial judges may continue to depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime.[25]

However, because of the increased sophistication of the second edition of the guidelines and because they represent the sentencing practices of the great majority of our state's sentencing judges, they become a useful tool in carrying out the legislative scheme of properly grading the seriousness and harmfulness of a given crime and given

utes. Alas Stat, § 12.55.155(f); 5 Ariz Rev Stat Ann, § 13-702(E); N J Stat Ann, § 2C:44-1f.(1), (2); 7A Tenn Code Ann, §§ 40.35.105-40.35.108. See also Cal Penal Code, § 1170(b).
There is a more complex departure policy in the federal guidelines.

> [T]he Sentencing Reform Act, despite its vast efforts to structure and constrain judicial discretion, nonetheless provided for judges to depart when they found "that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described." [Nagel, *supra,* p 938, quoting 18 USC 3553(b).]

[25] Such trial court decisions remain, of course, subject to review in accordance with this opinion.

offender within the legislatively authorized range
of punishments. We believe that the gradation of
recommended sentencing ranges within the guide-
lines indicates not only that the full statutory
range of possible sentences is being used, but also
that the recommended ranges increase as the fac-
tors that *are* adequately represented in the guide-
lines become more serious. For this reason, we
believe that it is safe to assume that in the eyes of
the vast majority of trial judges who have chosen
to impose sentences within the guidelines ranges,
the guidelines reflect the relative seriousness of
different combinations of offense and offender
characteristics.

It is worthwhile to note again in this context the
concerns of Judge SHEPHERD, concurring in *People
v Rutherford, supra,* pp 280-281.

> If the guidelines did set binding limits on the
> trial court's discretion, I would be constrained to
> remand when the judge states reasons for depart-
> ing from the guidelines which are already consid-
> ered therein. The problem we face in these cases is
> that the guidelines include factors such as the
> severity of the offense, the past record of the
> defendant, and the sentences historically imposed
> throughout the state. If the trial judge justifies a
> departure from the guidelines by stating that he
> does so because of the nature of the offense and
> the record of the offender, the trial court has
> considered these factors twice. If we say that the
> trial judge may, in an individual case, place
> greater emphasis on any given factor by simply
> announcing on the record his intention to do so,
> the guidelines become nothing more than a litany
> of magic words used to mask the imposition of
> subjective, arbitrary and disparate sentences—the
> very problem which *Coles* and the guidelines were
> designed to eliminate. If the sentencing judge is

not held to have abused his discretion by emphasizing a factor already included in the guidelines as a basis for departing from them, and if the record is devoid of evidence showing whether a sentence beyond the guidelines is disparate, we are furnished with no basis other than our own subjective reactions upon which to base a decision. The risk of imposing an arbitrary and disparate sentence is thus shifted from the trial courts to the Court of Appeals.

These observations are well taken. Even though sentencing within the guidelines is recommended rather than compulsory, departures from the guidelines, unsupported by reasons not adequately reflected in the guidelines variables, should nevertheless alert the appellate court to the possibility of a misclassification of the seriousness of a given crime by a given offender and a misuse of the legislative sentencing scheme.

We believe that the discretion of trial courts adhering to the guidelines is not unduly restricted, since the recommended sentence range in a given cell of the guidelines is generally quite broad. We thus reject again[26] the dissent's suggestion that it is at all possible to "replace discretionary sentences with the more nearly determinate sentences set forth in the grids" (*post,* p 687), for the grids, far from setting forth specific sentences, instead set forth a range of possible minimum sentences from which a judge intending to stay within the guidelines can choose.

Where there is a departure from the sentencing guidelines, an appellate court's first inquiry should be whether the case involves circumstances that are not adequately embodied within the variables

[26] See n 18.

used to score the guidelines.[27] A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court to the possibility that the trial court has violated the principle of proportionality and thus abused its sentencing discretion. Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality. See *People v McKinley,* 168 Mich App 496, 512; 425 NW2d 460 (1988). ("We do not dispute that a prison sentence—even a lengthy one—is in order. We conclude, however, that a fifteen-year minimum sentence for the events that occurred here is disproportionate to the specific acts committed and the danger involved. *Too frequently reasons are given for a sentence that apply equally to a lesser or greater sentence unless an explanation is offered on the record for the specific sentence given.* Such was the case here.") (Emphasis added.)

In some cases, there may be important sentencing factors that are not included in the sentencing guidelines. Perhaps the clearest example of such a factor is the prior relationship, if any, between the victim and the offender. The Sentencing Guidelines Advisory Committee has sought to identify variables that are uniformly mitigating or aggravating.[28] A prior relationship between a victim and

---

[27] The Court of Appeals explained in *People v Morin,* 144 Mich App 142, 144; 372 NW2d 691 (1985), that cases have held that a judge may depart from the guidelines on the basis of a factor that is already included within the sentencing guidelines. We decline to overrule those cases, since there will be occasions when the conduct or the criminal record to be scored under the sentencing guidelines is extraordinary in its degree, and thus beyond the anticipated range of behavior treated in the guidelines. Nevertheless, we believe that the judge's right to depart in this fashion should be exercised with caution.

[28] In selecting variables for inclusion, the Sentencing Guidelines

an offender can be a very mitigating circumstance or a very aggravating circumstance, depending upon the history of interaction between the parties. Other important aspects of the case might not be found among the guidelines' variables, if these aspects do not occur frequently in criminal cases or cannot be neatly scored on a numerical scale.

Conceivably, even a sentence within the sentencing guidelines could be an abuse of discretion in unusual circumstances. See *People v Broden,* 428 Mich 343, 354, n 18; 408 NW2d 789 (1987). As noted above, in the interest of allowing the guidelines to continue to evolve, trial judges shall remain entitled to depart from the guidelines if the recommended ranges are considered an inadequate reflection of the proportional seriousness of the matter at hand. Just as the guidelines may not be a perfect embodiment of the principle of proportionality, so too may a sentence within the guidelines be disproportionately severe or lenient. Thus, contrary to the implication of the dissent's repeated observation that departures may be risked only "on pain of reversal" (*post,* pp 670, 692), the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range.[29]

---

Advisory Committee has sought to identify variables that would be (a) nonprejudicial, (b) uniformly mitigating or aggravating, (c) frequently occurring, (d) related to the goals of sentencing, and (e) "objective" in the sense that one could write instructions that would lead most people to be able to reach the same categorical decisions. McComb, *An overview of the second edition of the Michigan Sentencing Guidelines, supra.* In light of these ground rules, the committee understood and intended that the guidelines would not contain every consideration that can properly be weighed in imposing sentence.

[29] The guidelines do not address all crimes or even all felonies. Sentences for crimes not included in the guidelines, of course, remain reviewable under the principle of proportionality.

## VI. THE POSITION OF THE DISSENTING OPINION

### A

The gravamen of the dissent is that the enormous sentencing discretion which the Legislature left to the judiciary is, in sharp contrast to every other discretionary sphere of judicial activity, to be exercised at will in the trial court to the extent that appellate courts may do nothing more than assure themselves that the trial court has not exceeded the statutory maximum.

Seven years ago in *Coles,* however, we unanimously rejected the very position now advocated in the dissenting opinion. *Coles, supra,* p 535.

To adopt the position of the dissenting opinion— that the scope of sentence review should be so narrowly circumscribed that *any* sentence up to the statutory maximum must be upheld on appeal —would be to turn back the clock not just seven years to the pre-*Coles* era, but a full eighteen years to undercut the validity of our landmark decision in *People v Tanner,* 387 Mich 683; 199 NW2d 202 (1972), in which we held that the minimum term of incarceration in sentences imposed under the indeterminate sentence act could not be greater than two-thirds of the maximum term.

In *Coles, supra,* p 547, this Court canvassed the ABA standards and the practices in other states, concluding:

> [O]ur research indicates that there are at most only ten states in this country which do not allow any form of appellate review of sentences. The remaining states, either by statute, court rule, or case law, allow some form of appellate review of sentences, although the scope of review varies widely from state to state.

And since *Coles,* the national trend has pushed forward. Our sister states have continued to adopt a variety of measures to diminish the recognized evils of disparate sentencing.[30]

Professor Nagel, in her comprehensive article on sentencing in the federal system, relates the following:

> With utmost candor, Judge Frankel pierced the veiled myth of prisons as rehabilitative, and unfettered judicial discretion as right minded, when he concluded from his experience that unlike medical diagnoses, with criminals it is impossible to determine when, if ever, the "patient" will be "cured." Many echoed the systematic failure of coercive rehabilitation. . . .
>
> If there were any who clung to indeterminate sentencing for reasons other than its alleged tie to rehabilitation, now shown to be devoid of any empirical support, the outpouring of research on the other theme—disparity—paved the way for the emergent commitment to restructuring discretion. Justice Potter Stewart, writing as early as 1958, noted: "It is an anomaly that a judicial system which has developed so scrupulous a concern for the protection of a criminal defendant throughout every other stage of the proceedings against him should have so neglected this most important dimension of fundamental justice." This dimension was "equal justice under the law." [*Shepard v United States,* 257 F2d 293, 294 (CA 6, 1958).]
>
> Disparity studies multiplied; consistently, the results revealed gross variations that could neither be explained by rational categorization of criminals, nor justified by referring to treatment goals. . . .
>
> \* \* \*
>
> On reflection, it appears that Congress chose to heed the calls of Judge Marvin Frankel and the

[30] At present, it appears that approximately five states do not allow defendants to appeal their sentences.

cadre of other distinguished legal scholars joining
him to combat head on the unacceptable conse-
quences of unfettered discretion. [Nagel, pp 896-
899.][31]

B

We do not share the dissent's belief that the
effect of today's decision will be to drastically
curtail the discretion and flexibility of our sentenc-
ing judges. We thus reject the dissent's suggestions
that the result of our opinion is to "circumscribe a
trial court's statutory authority to tailor minimum
sentences to the particular offender and the partic-
ular offense" (*post*, p 670); that a "trial judge may
no longer apply personal experience, education,
intuition, or judgment to draw inferences from
evidence to determine the appropriate sentence for
a given offender" (*post*, pp 671-672); that to "hold a
given penalty unlawful . . . is simply to say there
is no discretion" (*post*, p 687); and that our deci-
sion will irrationally "compel a trial judge who
hopes to impose a just sentence to treat the indi-
vidual convicted of one hundred prior felonies the
same as the defendant who committed two such
felonies" (*post*, p 685).

The unspoken assumption underlying these
claims appears to be that appellate review of
discretionary decisions is equivalent to the whole-
sale destruction of discretion itself. Discretion,
however, is a matter of degree, not an all or
nothing proposition. The dissent's assumption and
the conclusions that follow from it are untenable.
They are refuted by the fact that trial judges
throughout this state are ably exercising their full
discretionary responsibilities over a wide range of
matters that come before them, knowing that they

---

[31] See § III(B) for additional discussion of some of the unacceptable
consequences of unfettered sentencing discretion.

are subject to review on an abuse of discretion basis according to law, developed in cases such as this, which sets parameters and standards for the exercise of that discretion.

It is unquestionably the trial court, and the trial court only, which is empowered to hand down a sentence. It is just as unquestionable that the trial court alone is empowered to conduct a trial, fashion equitable remedies, grant divorces, award alimony and child support, terminate parental rights, and fulfill all of the innumerable other judicial responsibilities that are vested in the trial bench. And, of course, it is the responsibility of the appellate courts, and the appellate courts only, to carry out their function, which is to review the performance of judicial functions in the trial court. If and when it is determined that a trial court has pursued the wrong legal standard or abused its judicial discretion according to standards articulated by the appellate courts, it falls to the trial court, on remand, to exercise the discretion according to the appropriate standards. Thus, while it is true that the trial courts will continue to impose sentences "on pain of reversal" (*post,* pp 670, 692), the same can be said of *every* discretionary trial court decision.[32]

We likewise disagree with the accusations that we seek to impose our philosophy on the trial judges (*post,* pp 670-671), and that we are guilty of assuming our "sentencing philosophy is somehow superior to the trial court's judgment" (*post,* p 684). We certainly do not for a moment suggest

[32] The dissent levels against this opinion the charges that our decision is "a resounding vote of 'no confidence' in the ability of trial judges to operate in a fundamentally fair manner" and that it is "an indictment of the sentencing judge." (*Post,* p 701.) We find it regrettable that our colleague finds it necessary to employ such rhetoric, especially in that it adds so little to the resolution of a seemingly intractable problem that is plaguing the administration of justice across the country.

that our philosophy is superior to that of anyone. We do work on the assumption that it is the appellate courts, in reviewing thousands of cases, that must and do get a sense of that disparity and that ultimately must interpret the legislative will. And it is the guidelines, which reflect the sentencing practices of the *trial* bench, that can help the appellate courts assess disparity.

We do not suggest that in the day-in-day-out review of sentencing issues appellate courts should simply substitute their judgment for that of the trial court. Indeed, such de novo review of sentences would be unprecedented in the realm of criminal appeals and at odds with any reasonable construction of the term "abuse of discretion."

C

The dissenting opinion contains no authority for the policy view that, unlike all other areas of the law where judges are given discretion, *sentencing* discretion ought not to be reviewable. The dissent not only disregards *Coles,* but, in arguing that its position carries the blessing of the Legislature, fails to cite any statutory authority for the proposition that the result of that case—that sentencing decisions are subject to appellate review—has been overruled by statutory enactment. Indeed, the only provision which the dissent cites addresses not appellate review, but merely the authority to *impose* sentences, *post,* p 680, n 19, a task which, like innumerable other *reviewable* judicial duties, belongs in the province of the trial court. This unremarkable statutory provision does not support the conclusion that appellate review of sentencing decisions is foreclosed. Despite the accusation of the dissent, while an increase or decrease in the prison population may result from a decision of

this Court,[33] it is not, nor should it be, a legitimate goal or purpose of an appellate court to consider such effects. It is our duty and purpose to find meaning in the discretionary range provided in the criminal code and to see to it that it is carried out.

### VII. APPLICATION OF THE STANDARD
### OF SENTENCE REVIEW

We find that the imposition of the maximum possible sentence on Mr. Milbourn for the acts he committed clearly violated the principle of proportionality and therefore constituted an abuse of discretion. We have reviewed with care the entire record of this matter and, with all respect for the trial judge's difficult determination, we are persuaded that the breaking and entering committed by the defendant does not rise to a level of seriousness that warrants the most severe penalty the law can inflict for that crime. We therefore conclude that the trial court abused its sentencing discretion, violating the intent of the Legislature to reserve the most severe sanctions for the most serious combinations of the offense and the background of the offender, and that resentencing is therefore required.

The facts of the instant case, to be sure, do not constitute a typical burglary; whereas a more typical crime of that sort involves entry into the home of a stranger for the purpose of committing a larceny or an assault, Mr. Milbourn broke into an apartment in which he himself had resided for the apparent purpose of making an emotional and

---

[33] The most recently available departure statistics indicate that sentencing judges more frequently depart *below* the guidelines' recommended ranges than above. Thus, the dissent errs in suggesting that the majority of this Court feels "compelled" to reduce the prison population. (*Post,* p 692.)

destructive statement about the breakup of his relationship with the complainant. The acts accompanying the acts for which Mr. Milbourn was sentenced to the maximum term of ten to fifteen years were visited against property rather than persons.

The prior relationship of the defendant and the victim does not appear to be an aggravating factor in this case. Mr. Milbourn did not have a long history of hostile acts against the complainant, and he had not at the time of this offense engaged in other malicious behavior toward the victim.

The burglary statute under which Mr. Milbourn was convicted proscribes a broad range of criminal conduct: it imposes liability for breaking and entering "with intent to commit *any* felony or larceny . . . ."[34] This provision thus encompasses not only entries with intent to maliciously destroy personal belongings, but also those accompanied by an intent to murder, assault, rape, steal or commit arson.

In our discussion of proportionality, we observed that the Legislature has determined to visit the stiffest punishment against persons who have demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system. Mr. Milbourn was a young man and, at the time the instant offense was committed, he had no criminal record.

The facts of this case did not, in short, justify imposition of such a severe sentence. The trial judge, by sentencing Mr. Milbourn to the maximum possible term, has left no room for the principle of proportionality to operate on an offender convicted of a breaking and entering who has a previous record for this kind of offense or whose criminal behavior is more aggravated than

[34] MCL 750.110; MSA 28.305 (emphasis added).

in Mr. Milbourn's case.[35] The dissent has more graphically set forth the series of events consisting of assaultive behavior and destruction of property between December 18, 1984, and January 3, 1985, that were directed at the defendant's former live-in companion. While the defendant was clearly out of control during this period in which he was arrested three times and out of which he was prosecuted twice, it is still a fact that it was essentially one episode of irrational and destructive behavior directed at the same victim. We would not suggest that these acts in their totality do not merit imprisonment or a departure from the guidelines. We do, however, conclude that they do not rise to the maximum penalty that the Legislature has prescribed for the crime of which he was convicted.[36]

### VIII. APPLICABILITY OF THIS DECISION

As in *Coles, supra,* p 551, it is our judgment that our present decision to modify the nature of appel-

---

[35] It is immaterial to the result that Mr. Milbourn was sentenced under the first edition of the guidelines. First, resort to the guidelines is not necessary where the most severe possible sentence has been imposed in a case as replete with mitigating factors as the present. Second, it is the second edition of the guidelines, not the first, which more accurately reflects the relative severity of particular cases and which, therefore, is the most useful available tool for conducting a proportionality analysis even where the sentence was imposed pursuant to the first edition.

[36] Judge Kallman, prior to the conviction in this case, took a plea from the defendant in the neighboring county of Ingham for attempted malicious destruction of property and, because his sentence was imposed after that of Judge Shuster, presumably had before him all of the same information about the defendant and his activities. Judge Kallman declined to impose the maximum sentence. Furthermore, although Judge Kallman could have decided to impose a sentence on Mr. Milbourn which would run consecutively to that handed down by Judge Shuster, he determined not to do so. See *People v Chambers,* 430 Mich 217; 421 NW2d 903 (1988) (when an offender commits a crime while free on bond for a prior felony, the judge last to sentence the offender may impose a consecutive sentence).

late sentence review applies to: (1) currently pend-
ing appeals in which the issue of sentence length
has been raised and preserved,[37] (2) currently pend-
ing first appeals in which the appellant's initial
brief has not yet been filed, and (3) appeals filed
after the date of this decision.

### IX. RELIEF

For the reasons set forth above, we vacate Mr.
Milbourn's sentence and remand the case to the
trial court for resentencing.

LEVIN, CAVANAGH, ARCHER, and GRIFFIN, JJ.,
concurred with BRICKLEY, JJ.

BOYLE, J. (*dissenting*). Inventing the authority to
resolve this case, the majority today unmistakably
disenfranchises the trial court judiciary of its
unique role as the link between a defendant and a
victim and between community values and the
goals of the criminal justice system. I dissent.

The only issue which confronts us in this case is
one of policy: whether we should circumscribe a
trial court's statutory authority to tailor minimum
sentences to the particular offender and the partic-
ular offense. Despite the fact that the Legislature
has not chosen to limit the trial court's discretion,
the majority holds that trial judges are to sentence
within court-created guidelines on pain of reversal,

---

[37] The dissent has attached an appendix said to prove "how fre-
quently the guidelines fail to reflect the seriousness of the crime or
the offender's prior criminal history." (*Post,* p 695.) We caution
against an assumption that any case held in abeyance pending the
release of a given opinion is considered likely to be affected by that
decision.

By the same token, we caution against the assumption that we
have formed any opinion regarding either the dissent's characteriza-
tion of the factual underpinnings of these cases, or their proper
resolution, despite the dissent's admitted willingness to delve into
review of the merits of those cases absent briefing and oral argument.

and that appellate judges may reverse sentences by substituting their judgment for that of the trial court. Hereafter, the plea of the defendant who seeks a more lenient sentence than that called for by the guidelines as well as that of the prosecutor who seeks a harsher sentence, is to be filtered through the opaque lens of appellate review.

The trial court found that Mr. Milbourn was a dangerous person. That finding was based on record evidence that the defendant terrorized the complainant, threatened her and others, assaulted her and a companion with a shotgun, cut up her clothing and furniture, and indicated by repeated conduct that he would not leave her alone. The majority simply ignores the objective verification for the trial court's conclusion and characterizes the situation as a lovers' quarrel involving compelling mitigating circumstances and defendant's acts as merely an "emotional and destructive statement . . . visited against property . . . ." *Ante,* pp 667-668.

Today's decision reaches every sentence by a trial judge. It invites the Court of Appeals to treat as presumptively illegal every sentence which is longer or shorter than the Court's guidelines and impermissibly delegates a vital function of the criminal justice system, sentencing, to a committee of this Court, unelected and not responsible to the public.

The majority's "objective" philosophy of sentencing means that the trial judge may no longer apply personal experience, education, intuition, or judgment[1] to draw inferences from evidence to

[1] This way of "knowing" links the knower with the community, in contrast with objectivism which has been described as follows:

 The first of these traits [of objectivism] is that the academy will be objective. This means that it holds everything it knows

determine the appropriate sentence for a given offender. Instead, despite an evidentiary basis for the trial court's conclusion, a sentence will hereafter be regarded as an abuse of authority unless it conforms to the statistical pattern produced by the grids or rests on a reason for departure which an appellate court will recognize as warranted.

I

On April 16, 1985, the defendant was found guilty by a jury of breaking and entering an occupied dwelling with the intent to commit malicious destruction of property worth more than $100.[2] The offense arose out of an incident[3] occur-

---

at arm's length. It distances the knower from the world for a very specific purpose; that is, to keep its knowledge from contamination by subjective prejudice and bias. But even as it does this distancing, it divorces that knowledge—a part of the world—from our personal life. It creates a world "out there" of which we are only spectators and in which we do not live. That is the first outcome of the objectivist way of knowing.

Secondly, objectivism is analytic. Once you have made something into an object (in my own discipline, that something can be a person), you can then chop that object up into pieces to see what makes it tick. You can dissect it, you can cut it apart, you can analyze it, even unto death. And that is the second habit formed by the objectivist mode of knowing.

Third, this mode of knowing is experimental. And I mean this in a broad and metaphoric sense, not laboratory operations per se. I mean by experimental that we are now free with these dissected objects to move the pieces around, to reshape the world in an image more pleasing to us, to see what would happen if we did. It is this "power over the world" motif that I am reaching for when I say "experimentalism" in the epistemology called objectivism. [Palmer, *Community, conflict, and ways of knowing,* 19 *Change* 20, 22 (Sept/Oct 1987).]

---

[2] MCL 750.110; MSA 28.305.

[3] The facts set forth in the lead opinion are antiseptically recited from the perspective of a majority that has selected the case as a vehicle for "reform." For example, the majority's statement that "at the time of this offense" the defendant had not engaged in other malicious behavior toward complainant, while technically true, is intentionally misleading. The breaking and entering was the first in a

ring on December 18 or 19, 1984, when the defendant broke into the apartment of his former girl friend by forcing open the bedroom window and cutting the screen, and then damaged the apartment and destroyed much of the victim's clothing and furniture.[4]

At the defendant's trial on the breaking and entering charge, the victim testified that on December 18, 1984, at approximately 8:20 P.M., the defendant came to the store where she worked at a second job in the evenings and told her he had just gotten a new job and that he would like to talk to her. When the victim indicated she wanted nothing to do with the defendant and that she did not wish to talk to him, he went out the door and said, "You've had it," and shook his fist.

Later that night, shortly before 12:30 A.M. when the victim was expected to finish work, the defendant pulled into the lot and asked to speak to the victim's friend, who was waiting for her in her car in the parking lot. The friend testified that the defendant said he still loved the victim and wanted to be reconciled with her, and that when they walked over to the defendant's truck the defendant took a shotgun from the cab of his truck. The witness said that the defendant pointed the gun at him and told him that he (the defendant) could blow him away, but he would not and that he did not like him (the witness) seeing the victim. The witness also stated that prior to the

series of incidents and cannot be evaluated in isolation. It falls to me to restate the facts from a pro-victim standpoint so as to set forth the contrasting inferences to be drawn from these events.

[4] Prior to being charged with this offense, the defendant was charged with felonious assault in an incident involving a friend of the victim. In fact, by the time the defendant's trial on the breaking and entering offense began, he had been charged with three additional offenses, all of which were committed against the same victim. In that case he pled guilty to one of the offenses in exchange for a dismissal of the other charges.

shotgun incident, while they were talking, the defendant displayed a knife he was carrying. Afterwards the defendant kicked one of the hubcaps off the victim's car and smashed it.

When the victim came out of work, the defendant, armed with the shotgun, approached her in the parking lot and said, "Don't call the police on me." The victim testified that she did not know what the defendant was talking about because at that time she was unaware of what he had done. She also stated that he said he knew it was over between them, but that he was going to get her car and that she could mark his words. The defendant left when he noticed that someone went back into the store to call the police. When the police arrived, the victim and her friend filled out police reports in the parking lot and then filed a complaint at the Eaton County Sheriff's Department.[5] The defendant was arrested the same day and charged with felonious assault in Eaton County.[6]

At the preliminary examination on the breaking and entering charge, the victim testified that the defendant had previously lived with her at her apartment from October 22, 1984, to December 12, 1984.[7] She also testified that she had asked the defendant to move out about the middle part of November, but that he had kept stalling, telling her he did not have any place to go.[8] She stated

[5] The complaint noted that the defendant "did make an assault upon [the victim's friend] with a dangerous weapon, to-wit: a shotgun, but without intending to commit the crime of murder or to inflict great bodily harm less than the crime of murder . . . ." MCL 750.82; MSA 28.277.

[6] He was held in custody until December 26, 1984, when he was released on a personal recognizance bond. The charge was eventually dismissed in December of 1985.

[7] The preliminary examination for the instant offense was held on January 17, 1985.

[8] She testified that although the defendant had moved in with her when she had initially rented the apartment in October, only her name was on the lease.

that she had the locks changed twice after the defendant finally had moved out.[9]

At trial the victim testified that when she returned to her apartment in the early morning of December 19, 1984, after the incident with the defendant in the parking lot, she found the apartment had been broken into. The victim testified that she found the "whole place in trash." A police officer dispatched to the scene of the crime testified that upon entering the apartment living room, he found that the television had been smashed, tipped over from the table onto the floor, and the furniture in the room had been slashed or cut, apparently with a sharp cutting instrument, such as a knife. There were about thirty or forty items of clothing that also had been slashed and strewn about the room.

In the bedroom area, the bedding and drapes had been cut, as well as the coats and clothing hanging in the closet. In addition, the phone cord, the bathroom towels, and the shower curtain were cut, several holes had been put in the walls, and red paint had been sprayed on the carpet and drapes. The living room end table was broken, and it appeared that someone had used his feet or hands to punch three larger holes in the victim's hallway and bedroom walls. The victim told the police officers that she suspected the defendant was the offender and filed a police report that morning.

After the altercation in the parking lot, the

---

[9] The first time she changed the locks because the defendant had taken her car without permission and the apartment key was on the ring with the car keys. The second time she had given the defendant's father the key to the apartment on December 12 so that he and the defendant could move out the defendant's belongings, which they did on that same day. However, when the defendant returned the keys he had switched them, and the key which was returned was not her apartment key. To prevent his return to the apartment, she changed the locks on the following day, December 13.

victim stated that she did not hear from the
defendant again until December 27, 1984, the day
after he was released from custody in connection
with the felonious assault charge. He called the
victim at the bank where she worked during the
day and said he had committed the crime (break-
ing into her apartment), offered to pay for the
damage, and promised to leave her alone if she
would drop all the charges in Eaton County.

The next day the defendant came into the bank,
cashed a check, and offered to take the victim
shopping for new clothes. When she refused, the
defendant went over to the shopping area across
from the bank and called the victim ten or fifteen
times. She also received about five letters from the
defendant in which he threatened that if she did
not drop the charges, he would send "lewd" photo-
graphs of her to her stepfather, her co-workers,
and her friends.[10] She further testified that the
defendant had a tendency to become "very upset"
and to go "into a rage."

On January 3, 1985, one week after the defen-
dant had been placed on bond for the felonious
assault charge in Eaton County, he was arrested
in Ingham County for the offenses of malicious
destruction of property over $100 and assault and
battery. In both offenses the defendant's ex-girl
friend again was the victim. These offenses oc-
curred when the defendant again approached the
victim in a parking lot. When she refused to roll
her car window down and talk with him, the
defendant flattened the left front tire of her car,
smashed out the car window, crawled through and
physically restrained the victim from leaving the

[10] The defendant denied telephoning the victim at the bank fifteen
times in one day or trying to blackmail her with the pictures. He also
denied calling her father in January, 1985, and telling him, "I'm
going to murder your fucking daughter."

car. The victim suffered cuts from broken glass. Two witnesses saw the defendant crawling through the window and called the police.

On January 23, 1985, the defendant pled guilty of attempted malicious destruction of property in exchange for the dismissal of the assault and battery charge. These charges arose out of the incident on January 3, 1985.[11] Sentencing the defendant to a term of one year in the county jail, the judge explained his departure from the guidelines maximum-minimum sentence of three months:

> [Defendant] was on bond for [felonious assault] when he committed the instant offense. All offenses are against the same victim—directly or indirectly. The victim fears [the defendant]. The [defendant] needs intensive counseling from the jail staff before he is released.[12]

At his trial for the instant offense, the defendant testified that on December 18, 1984, he drank about twelve beers and then went over to the victim's apartment to get his personal belongings and discovered the locks had been changed. He stated that he did not remember much after going through the bedroom window except that he took his things and let himself out through the front door. He said he then went to where the victim

[11] The presentence report contained a statement by defendant that he committed the crime because he felt that the victim owed him an apology and he just wanted her to roll the window down. When she did not, he stated he just jumped through the window of the car because he was furious, confused, hurt inside, and "pissed off." The defendant's sentencing was delayed until December 16, 1985.

[12] At defendant's arraignment on the charge of breaking and entering with the intent to commit a felony, specifically malicious destruction of property, the judge took into consideration the fact that only the day before the defendant pled guilty to the attempted malicious destruction charge involving the same victim, and agreed to increase defendant's bond to $10,000 cash or surety.

worked to give her a card. He admitted that while they did not fight that night in the store, they had been having fights about him "catching her in bed with another guy." He then said that later he went back up to the store, some time between 12:00 midnight and 1:00 A.M., and talked to the victim's new boyfriend, telling him, "I would appreciate it if you would keep away from [the victim], because you are going to get me upset."

On cross-examination, the defendant stated that he used a rock to cut the screen of the victim's window. He admitted he had brought a knife with him that night, but that he had left it in his truck and did not have it in his possession when he was in the apartment. He also stated that he did not know who the man was that he had caught in bed with the victim or when it had happened. On April 16, 1985, after the two-day trial in Eaton County, the defendant was found guilty by a jury of breaking and entering an occupied dwelling with the intent to commit a felony.

The statute authorized a maximum sentence of fifteen years. Under the first edition of the guidelines the minimum range was twelve to thirty months, and under the 1988 revised guidelines the minimum range is zero to eighteen months. At the sentencing hearing, the trial court noted that the guidelines did not consider the pattern of assaultive behavior in which this defendant has been involved, both with the victim as well as others, or the dismissal of the second felonious assault charge.[13] The presentence report contained information that the defendant had a history of assaultive behavior: He was suspended from school for fighting, and while in the county jail he attacked

[13] Thus, the lead opinion's statement, that when the defendant committed the offense that gives rise to this appeal the defendant had no prior criminal record, is again technically correct yet misleading.

another inmate who had to be taken to the hospital and subsequently required numerous stitches in his head.

The trial judge concluded that the defendant was "an extreme danger to society," sentenced the defendant to a minimum term of ten years, and articulated his reasons[14] for imposing a minimum term which exceeded the guidelines minimum range.[15] The Court of Appeals affirmed the defendant's conviction, noting that "the trial judge

[14] Thus, significantly, this case does not involve a situation in which the trial court simply decided the guidelines were wrong.

[15] The trial judge stated:

The problem here is, we have a man that is a very sensitive young man, I believe in his own way, a very caring young man. . . . And the problem that has occurred here, as I have seen it, is that this young man has literally fits of rage with which he—not he or anyone else knows what the result might [be]. And it seems to me that we have seen the manner in which he went into the dwelling, then conducted himself in in the destruction of items, cut them up and destroyed the belongings in a violent manner and then, perhaps honestly, professed a total lack of recall of that conduct. Other testimony was presented about the violent . . . threats.

. . . The Court feels that this young man needs protective custodial care during which that he would receive mental health counseling. And then we'll assume that the Corrections Department will, themselves, have to make decisions as to whether or not they believe that he can return to society. That's not the function of this Court. The function of this Court is to protect society from someone who at this point in in [sic] time constitutes, in my opinion, an extreme danger to society.

It is the sentence of this Court that Kevin Michael Milbourn be sentenced to the maximum period provided by law, which is a minimum of 10 years and a maximum of 15 years in prison. . . .

In arriving at this sentence, I've considered the following factors: One, the deterrence in the future of any further criminal behavior by you.

Two, and this is a very very important item to this Court, the protection of society from you, because of your criminal behavior. And that factor has to be a paramount factor.

Three, we have a sincere hope for your rehabilitation. We don't know if it's possible, we would hope that it is. At this juncture, we don't know. That answer is going to be left to others.

Four, the requirement that there can be no safe society

stated his reasons for departing from the sentencing guidelines and the sentence does not shock our conscience."[16] This Court granted leave "[l]imited to the issue whether the ten- to fifteen-year sentence here, which was four times the high range of the Sentencing Guidelines, was an abuse of discretion or shocking to the conscience under *People v Coles,* 417 Mich 523 [339 NW2d 440] (1983)."[17]

## II

The legal flaw in the majority opinion may be simply stated. The Michigan Constitution[18] gives the Legislature the authority to provide for sentencing, a power which the people gave to that department of government. Pursuant to that authority, the Legislature enacted statutes which set the maximum punishment and gave the authority to set the minimum punishment to the trial court judiciary.[19] Thus, indeterminate sentencing is a

without law and there can be no effective law without punishment for its violation.

[16] Unpublished opinion per curiam of the Court of Appeals, decided February 24, 1987 (Docket No. 85990).

[17] 429 Mich 858 (1987).

[18] Const 1963, art 4, § 45 provides:

The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences.

This provision has been a part of the Michigan Constitution since 1850. Const 1850, art 4, § 47; Const 1908, art 5, § 28.

[19] The Legislature has indicated its intention to confer upon the trial courts alone the power to impose criminal sentences, setting forth the jurisdiction in MCL 769.1; MSA 28.1072, as follows:

A judge of a court having jurisdiction is authorized and empowered to pronounce judgment against and pass sentence upon a person convicted of an offense in that court. The sentence shall not be in excess of the sentence prescribed by law.

legislative delegation of constitutional authority to trial judges to tailor their sentences to the particular offender and the particular offense "within the legislatively prescribed range" of punishment for each felony. *Ante,* p 651. The Court has no authority to amend a statute. Nor can that authority be manufactured by taking the principle of proportionality between *penalties* for *different* crimes and converting it into an authorization to internally restrict the legislatively delegated authority of a trial judge to determine the sentence "within the . . . prescribed range" of punishment. As this Court itself has consistently recognized, "[w]hen a constitutional law has fixed the punishment for an offense, a sentence under that law is not cruel or unusual within the meaning of the Constitution." *People v Cook,* 147 Mich 127, 133; 110 NW 514 (1907).[20]

The majority uses the principle of proportionality to substitute its own subjective characterization that the defendant overreacted to the situational stress of a lovers' quarrel for the trial judge's conclusion that the defendant was a dangerous person.[21] In fact, "proportionality" is a concept

"The forerunner of this provision expressly included justices of the Supreme Court and judges having jurisdiction over criminal cases among those possessing authority to impose a sentence." *People v Coles,* 417 Mich 523, 537; 339 NW2d 440 (1983). However, as amended, the statute now excludes other courts from possessing jurisdiction to impose a sentence where one court already has exercised jurisdiction to convict and sentence a defendant.

[20] See also *In re Casella,* 313 Mich 393; 21 NW2d 175 (1946).

[21] As support for its new "proportionality" standard of review, the majority cites Judge SHEPHERD's concurring opinion in *People v Rutherford,* 140 Mich App 272; 364 NW2d 305 (1985). Unlike the concerns raised there, however, the trial judge in *Milbourn* did not abuse his discretion "by emphasizing a factor already included in the guidelines as a basis for departing from them," nor is the record "devoid of evidence showing whether a sentence beyond the guidelines is disparate . . . ." *Id.* at 280-281.

Here, it is evident the trial judge at the sentencing hearing took note that this case involves circumstances *not* included within the

relevant to the question whether a given sentence is cruel or unusual punishment under the Eighth Amendment of the United States Constitution as compared to punishments for similar crimes in other states and at common law. There simply is no principle of "internal" proportionality requiring all persons convicted of the same crime to be treated similarly, even as a condition for imposing the death penalty, *Pulley v Harris,* 465 US 37; 104 S Ct 871; 79 L Ed 2d 29 (1984). Nor does the exercise of discretion render even that most onerous penalty unconstitutional where standards guide the exercise of that discretion. In rejecting the petitioner's claim that the discretion inherent in a penalty imposition was unlawful, Justice Powell observed in *Gregg v Georgia,* 428 US 153, 225-226; 96 S Ct 2909; 49 L Ed 2d 859 (1976), in words appropriate to today's result:

> Petitioner's argument that there is an unconstitutional amount of discretion in the system . . . seems to be in final analysis an indictment of our entire system of justice. Petitioner has argued, in effect, that no matter how effective . . . [the] punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it. . . . Mistakes will be made and discriminations will occur which will be difficult to explain. . . . I decline to interfere . . . on what is

variables used to score the guidelines. For example, he pointed out they do not consider such important factors as the defendant's pattern of assaultive behavior, both with this victim and others, or the dismissal of his second assaultive charge. Nor is the instant case a situation where the record is devoid of evidence supporting the trial judge's conclusion of the defendant's dangerousness. On the basis of the presentence report and other record evidence, the trial court found that the defendant terrorized the victim, threatened her and others, assaulted her and a companion with a shotgun, physically destroyed everything she owned, and had a past history of assaultive behavior toward others. Clearly, *Milbourn* is not a case where the sentencing judge is ignoring the guidelines and merely substituting his own judgment.

simply an assertion of lack of faith in the ability of
the system of justice to operate in a fundamentally
fair manner.

The proportionality analysis theorizes that be-
cause the Legislature has established a hierarchy
of offenses in general and a range of punishment
for each individual offense, it must have intended
that the most serious offender within a given
category receive the greatest punishment. There is
nothing in the first truism, however, from which it
logically follows that the Legislature has author-
ized this Court to decide that sentences within a
lawful range are unlawful. Instead, the grant of
authority to the trial judge is the express state-
ment of legislative intent that the trial judge, not
this Court, is the arbiter of that decision. The
second premise for the claim that the majority's
proportionality analysis furthers legislative intent,
that is that the Legislature has established mini-
mums and maximums, is simply incorrect. The
fact is that the first incursion into sentencing
discretion was this Court's decision in *People v
Tanner,* 387 Mich 683, 690; 199 NW2d 202 (1972),
holding that two-thirds of the maximum was the
stiffest possible sentence. Thus all references by
the majority to the maximum possible sentence
actually reference the "incidental" (*ante,* p 636)
limitation of trial court discretion imposed on the
judiciary by this Court. Neither the two-thirds
maximum minimum, nor the contemporary legis-
lative pattern of generally increasing the severity
of sentences provides any justification for today's
creation of another incursion into discretion. Since
it is not the Legislature, but rather this Court that
has so confined discretion, it cannot be said that
the trial court's exercise of discretion violates
legislative intent. Rather, it is this Court's intent

to confine the exercise of trial court discretion that motivates the Court's treatment of two-thirds of the legislative maximum *as if* this number represented the legislative expression of the seriousness of the crime.

Having thus set the stage by defining proportionality not in relation to the maximum established by the Legislature, but rather by the maximum selected by this Court, the Court then plugs in the guidelines to conclude that their range is "a useful tool in . . . grading . . . a given crime and given offender within the legislatively authorized range of punishments" (*ante,* pp 657-658). Because there "is no legislatively authorized range of punishments" for most indeterminate sentences, the statement is a non sequitur. More importantly the Legislature has conferred this discretion on the trial judge. Thus, the only support for the conclusion that an undeniably lawful sentence is unlawful is the tautological assertion by the majority that its sentencing philosophy is somehow superior to the trial court's judgment with regard to where an individual should fall on this continuum. "This is judicial usurpation with a vengeance . . . ." *Solem v Helm,* 463 US 277, 315; 103 S Ct 3001; 77 L Ed 2d 637 (1983) (Burger, J., dissenting).

III

Assuming arguendo that the Court has the authority to reverse a sentence on the basis that a departure from the guidelines constitutes an abuse of discretion, it does not follow that the trial court's finding in this case that the defendant was dangerous was an abuse of discretion. The sentence was based on objective factors supporting an inference of dangerousness. *People v Downey,* 183 Mich App 405; 454 NW2d 235 (1990). Thus, it

cannot be said that the departure from the guidelines was arbitrary or biased.

Like findings of fact in nonjury trials, findings of aggravating circumstances require drawing inferences from basic facts to ultimate facts. As the United States Supreme Court has recently recognized in the context of a collateral attack on the death penalty, *Lewis v Jeffers*, 497 US —, —; 110 S Ct 3092; 111 L Ed 2d 606, 624 (1990), it can be said that finding an aggravating circumstance is arbitrary or capricious "if and only if, no reasonable sentencer could have so concluded."

Secondly, there is no statistical basis to conclude that the guidelines represent the normative values of sentencing judges. Guidelines are an imprecise statistical tool that, as currently constructed, weigh the prior offense variable for a person who has been convicted of one hundred serious felonies the same as for a person who has been convicted of two serious felonies. Thus, it is illogical to conclude that departures unsupported by reasons not encompassed in the guidelines suggest "a misclassification of the seriousness of a given crime by a given offender" (*ante*, p 659). In fact, to compel a trial judge who hopes to impose a just sentence to treat the individual convicted of one hundred prior felonies the same as the defendant who committed two such felonies is irrational, both from the standpoint of a defendant who has *only* two prior convictions and from society's interest in deterring others from committing similar offenses and in disciplining a given "wrongdoer." *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972).

A

The majority does not address the fact that the guidelines for breaking and entering may simply

be inadequate to appropriately evaluate this offender and this offense, and thus furnish no basis for any assumption about the correct sentence for the defendant or for the conclusion that the sentence reflects the bias of the trial court.[22] It was surely neither arbitrary nor biased for the trial judge to conclude that the violent destruction of plaintiff's clothes, home, and car, everything that was hers, indicated a homicidal bent against the complainant herself. Indeed, from all appearances, it is sheer fortuity that the victim was not at home when the breaking and entering occurred and that she was not killed then or in the first incident in the parking lot. To be sure, this Court cannot know whether the defendant would have killed the complainant given the right opportunity. That reality is precisely the heart of the policy of discretionary sentencing.

The exercise of discretion, by definition, means

---

[22] The guidelines do not adequately address the significance of the defendant's repeated offenses committed against the same victim, or the fact that one week after being released on bond for breaking and entering and felonious assault, he committed a second felonious assault and the malicious destruction of property involving the same victim, that on this occasion he smashed the complainant's car window and physically restrained her from leaving the car.

The majority finds that "the imposition of the maximum possible sentence on Mr. Milbourn for the acts he committed clearly violated the principle of proportionality and therefore constituted an abuse of discretion" and that

> [t]he trial judge, by sentencing Mr. Milbourn to the maximum possible term, has left no room for the principle of proportionality to operate on an offender convicted of a breaking and entering who has a previous record for this kind of offense or whose criminal behavior is more aggravated than in Mr. Milbourn's case. . . . Just as the routine award of high grades demeans academic value, the routine imposition of maximum sentences would send a garbled message of society's views on the relative blameworthiness of various commissions of a given crime to the public as well as to the ultimate consumer of judicial sentencing behavior—the convicted offender. [*Ante,* pp 667, 668-669, 645-646.]

different results may be reached on the basis of
the same evidence. To conclude otherwise and hold
a given penalty unlawful because the majority
draws a different inference than the trial court did
from the same record is simply to say there is no
discretion. Thus, what the majority actually does
in recharacterizing the evidence as "mitigating"
and in concluding that the departure was arbi-
trary, is to replace discretionary sentences with
the more nearly determinate sentences set forth in
the grids.

Indeterminate sentencing assumes that offenders
and offenses are not truly fungible, *People v Bro-
den,* 428 Mich 343, 349; 408 NW2d 789 (1987).
Because no two cases and no two defendants are
ever really identical and no list of objective cir-
cumstances can ever encompass the universe of
situations surrounding activity that leads to crimi-
nal charges, the trial judge is legislatively deemed
uniquely qualified to evaluate the existential re-
ality of offense, offender, and victim.

We can all agree that unjustified sentence dis-
parity should be eliminated. The issue in this case
is, "when is a departure unwarranted?" The ma-
jority's observation that "[a] prior relationship
between a victim and an offender can be a very
mitigating circumstance or a very aggravating
circumstance," *ante,* pp 660-661, reveals the major-
ity's answer as classic question begging. Relief will
be available despite evidence justifying the depar-
ture when this Court or the Court of Appeals
subjectively decides that a departure is unjustified.

While I did not participate in the Court's opin-
ion in *People v Coles,* 417 Mich 523; 339 NW2d
940 (1983), it is unnecessary to disagree with the
principle that trial court decisions are reversible
for an abuse of discretion. In fact, the experience
under *Coles* is proof that there are only an infini-

tesimal number of cases in which trial courts have imposed sentences that are unjustifiably disparate. What I do not agree with is the majority's redefinition of abuse of discretion, which ignores the record basis for the trial court's sentence and recharacterizes the trial court's basis for departure by labeling the circumstances "mitigating." Surely a trial court exercising discretion understands that its decisions must be founded on fact and rooted in reason; just as surely, it does not expect that appellate court review under any extant standard of abuse of discretion permits the appellate judge to recharacterize the facts or reject plausible inferences drawn from them.

**B**

The assumption that the sentencing patterns of judges establish a normatively correct sentence range has no valid statistical basis. There is no basis on which to conclude that a substantial departure from the sentencing guidelines itself establishes that a trial judge has arbitrarily exercised sentencing discretion. *Ante,* pp 659-660. Indeed, the guidelines' revision, which assigned different weights to both offense and prior record variables, is an acknowledgment that the original guidelines were not intended to be definitive.[23]

Illustrative is *People v Squires,* No. 81985, Appendix B, p 708, where the defendant, an apparent

[23] For example, the compliance rate for offenders in these crime groups for which the maximum sentence is 15 years is: for assault, 63 percent, with 12.6 percent above and 23.9 percent below; for first-degree criminal sexual conduct, 59 percent, 20 percent above and the same below; for robbery, 65.5 percent, 24.5 percent above and 9.9 percent below. These percentages are taken from the statistical information compiled for the period from April, 1988, to September 30, 1988. *Michigan Supreme Court sentencing guidelines project: Departure profile for mandatory guideline period* (April, 1988, to September 30, 1988).

pedophile,[24] was sentenced to serve ten to fifteen years for criminal sexual conduct.[25] The guidelines' minimum range was zero to thirty-six months and under the 1988 revisions, is two to eight years. The result is that the ten-year sentence may have been a "substantial departure" from the three-year minimum called for by the 1987 guidelines, but not a "substantial departure" in 1988.[26]

Thus, although the Legislature has said that for the most serious sexual conduct offense in our system the penalty may be fifteen years, our Court would have been prepared to say in 1987 that the presumptive minimum should be no more than three years, and in 1988 that it should be no more than eight years.[27] When the disciplinary credits

---

[24] The defendant, age seventy-six, was convicted of two counts of second-degree criminal sexual conduct with two children, ages five and six. He had previously been convicted of accosting, enticing, and soliciting a child under the age of sixteen for immoral purposes, placed on probation, and warned to stay away from young children. The sexual contacts with the children continued over a substantial period of time during which the defendant, known as the "Cookie Man," invited children to his apartment, touched and kissed them in front of each other, took their clothes off, and took showers in front of them. The children related that when they were at his apartment, they had "played house" with each other, taking their clothes off, and touching and kissing each other. The mother of one of the victims related that the molestation traumatized her daughter who now has nightmares, hot and cold flashes, and was doing poorly in school. With disciplinary credits, the defendant is eligible for parole after approximately eight years, one month, and fourteen days.

[25] Because of this Court's decision in *People v Tanner*, 387 Mich 683; 199 NW2d 202 (1972), the trial court could not have imposed more than a ten-year minimum sentence.

[26] Likewise, in *People v Lopez*, No. 84690, the trial judge sentenced the defendant to twenty-five years which is within the 1988 guidelines, although under the 1984 guidelines the maximum minimum is fifteen years. See n 39. In *People v Lawrence*, No. 81954, Appendix B, p 737, the defendant received a thirteen-month sentence for setting fire to his brother's bed because they had argued, and, while no one in the apartment complex was hurt, the fire department had to be called. The 1988 guidelines range was zero to six months as opposed to the zero to three-month sentence range under the 1984 guidelines. The defendant spent less than a year in jail and was released from prison in 1987.

[27] The majority of the cases which this Court is holding in abeyance

automatically applied to Mr. Squires are factored into the 1988 guidelines, a fact the sentencing court may not consider, *People v Fleming,* 428 Mich 408; 410 NW2d 266 (1987), the actual minimum sentence for the most serious sexual conduct offense is six years, five months, and twenty-six days!

Any suggestion that guidelines represent the true normative values of the trial judiciary is, at best, disingenuous. The sentence patterns from which both grids are drawn in fact represent such an infinite and uncontrolled variety of circumstances, including this Court's successive limitations on trial judge discretion,[28] the charging deci-

pending the decision in *People v Milbourn* are cases in crime groups which the SGAC readily admits defy analysis. See Appendix B, the discussion of cases which fall within the robbery, assault, and criminal sexual conduct crime groups. See also McComb, *An overview of the second edition of the Michigan Sentencing Guidelines,* 67 Mich B J 863-864 (1988).

The cases the Court has held in abeyance for *Milbourn* also include both cases in which the sentence imposed by the trial judge is within, or barely exceeds, the 1988 guidelines, and cases in which, at the time the Court decided to hold the case in abeyance, the offense committed by the defendant was in a crime group not covered by the guidelines. In *People v Micou,* No. 83047, the defendant was convicted of conspiracy to commit armed robbery, an area not covered by the guidelines, and, as such, an area in which it was not possible for the trial judge to depart from the guidelines. Yet, the Court decided to hold this case in abeyance when a reviewing court could never invalidate the sentence under *Milbourn.*

In fact, there are a number of areas not presently covered in the guidelines, including habitual offenders, escape, and driving offenses. Recent legislative changes have given sentencing judges greater discretion in sentencing persons convicted of certain mid-level drug offenses (possession or delivery of 50 to 225 grams or 225 to 650 grams of a major controlled substance). Because judges formerly had little or no sentencing discretion in these offenses, they also are not presently part of the guidelines. McComb, *supra.*

[28] Among those steps that have made it impossible to conclude that sentence patterns represent the trial judiciary's true evaluation of appropriate penalties are these:

1) *People v Coles, supra,* sentences that shock the conscience constitute an abuse of discretion.

2) *People v Johnson,* 421 Mich 494; 364 NW2d 654 (1984), Proposal B does not apply to life terms.

sions of prosecutors and the findings of juries, that any inference from patterns to a "correct" normative sentence is from a statistical standpoint wholly invalid. In short, these statistics simply cannot be said to support the inference that the trial judge may have abused his discretion whenever the sentence is "unusual" as measured by sentence patterns. Sentence patterns do not establish statistically true sentence values and therefore departures cannot be assumed to be invidious.[29]

The logical invalidity of the majority's assumption is easily illustrated: by making departures the basis for reversal, the majority has made the guidelines the functional equivalent of new Court-established minimums[30] from which the trial judge

3) *People v Fleming,* 428 Mich 408; 410 NW2d 266 (1987), the sentencing court cannot consider statutory credits automatically reducing the defendant's sentence.

4) *People v Moore,* 432 Mich 311; 439 NW2d 684 (1989), a term of years exceeding life expectancy is unlawful.

5) Administrative Order No. 1984-1, 418 Mich lxxx (1984), the use of the Sentence Guidelines is mandatory.

[29] The fact that the compliance rates for certain crimes in the assault, criminal sexual conduct, and robbery crime groups have remained in the area of sixty percent under the revised sentencing guidelines is itself evidence that departure from the guidelines does not justify a reviewing court's presumption that the trial judge has abused his discretion.

Statistics now available indicate that compliance rates for crimes in these same crime groups remain in the area of sixty percent under the revised guidelines. The departure profile for the period beginning August 1, 1988, through January 1, 1990, is as follows: the compliance rate for assault is now 54.2 percent, and under the original guidelines it was 63.3 percent, for CSC it is 69.4 percent and under the original guidelines it was 59.6 percent, and for robbery it is 79.1 percent and under the original guidelines it was 65.5 percent. *Michigan Supreme Court sentencing guidelines project: Departure profile for mandatory guideline period* (August 1, 1988, to January 1, 1990).

[30] The House of Representatives recently passed sentencing guidelines legislation which would provide for the establishment of a Sentencing Commission and presumptive sentencing guidelines. The unfortunate effect of today's holding will inhibit judges from experimenting with various remedies—including more severe sentences to prevent and deter certain crimes, or less severe sentences when a

only departs, presumably by a day, a month, a year, or a decade, on pain of reversal by an appellate court. Henceforward, the sentencing patterns of the trial judiciary can be said to reflect only that discretion the trial judiciary guesses has not been eliminated by the majority opinion.[31]

In short, since both a departure based on a factor already included in the guidelines as well as a departure for a reason not factored in the guidelines can lead to reversal, the majority has used a statistically invalid assumption to create a self-fulfilling statistical prophecy. We can predict that when determinate minimums are routinely imposed because ninety percent (or more) of our trial judges have "gotten" the message in today's opinion, a deviation from that reduced baseline will be challenged on the ground that that departure is presumptively unlawful.

C

We may have reached a critical mass of prison population that a majority of this Court feels compelled to reduce. As a matter of wise policy, however, the majority's course cannot be justified by saying we must leave more room for a convicted offender who is worse than Mr. Milbourn, lest the imposition of high sentences, like "the

trial judge recognizes that an offender's prospects for probation might justify a more lenient sentence. The standard proposed will inevitably distort the data that the Sentencing Commission needs in order to develop sentencing guidelines.

[31] The guidelines were not intended to abolish indeterminate sentencing and eliminate disparity in sentencing. In fact, when in 1984 the Court by administrative order made use of sentence guidelines mandatory, the Court specifically encouraged departures from the guidelines. Administrative Order No. 1984-1, 418 Mich 1xxx.

At present the only limitation is that the judge must explain on the sentencing information report and on the record the aspects of the case that have persuaded the judge to impose a sentence outside the minimum range. Administrative Order No. 1988-4, 430 Mich ci.

routine award of high grades," *ante,* p 645, cease
to have any meaning. It is one thing to say society
is interested in the value of an "A." That interest
is the social benefit of encouraging one person out
of one hundred to achieve true potential. It is
quite another thing to say that society has no
interest in deterring ninety-nine people out of one
hundred from committing any crime at all so that
it can *really* punish the one-hundredth who has
committed a crime in the most serious way. If the
real reason for today's opinion is to provide a
safety valve for the crisis in prison population, the
surer and sounder course is to reverse decisions in
which, unlike that of the trial judge in the instant
case, the sentencing court simply disagrees with
the guidelines. This approach would encourage
trial judges to support their disagreement with
evidence while allowing room for less severe sen-
tences where the offender's prospects justify le-
niency and more severe sentences when warranted
by objective circumstances.

Thus I do not agree, as a matter of policy, with
the majority's suggestion that the prosecution can
appeal sentences that are "too low." In my view,
such an approach, while logically consistent with
the majority's result, is likewise unsound. Where a
downward departure is based on conclusions prop-
erly drawn from the record, appeals by the prose-
cution would likewise unjustifiably restrict trial
court discretion and potentially increase incarcera-
tion.[32]

---

[32] For example, it has already been noted that the second edition of
the sentencing guidelines eliminated certain mitigating factors previ-
ously included prior to 1988, i.e., avoiding harm, provocation, passion
and mistake/inadvertence in victim-precipitated homicides. Thus, the
Michigan Supreme Court Task Force on gender issues in the Court
has emphasized that "the guidelines no longer permit the sentencing
court to take into consideration the circumstances which are so often
present in these cases." See *Final Report of the Michigan Supreme*

IV

The sentence in the instant case is "unusual" only because the guidelines are inadequate to evaluate an individual who displays an unremitting pattern of criminal activity and a particularly malevolent purpose, i.e., behavior that rises to a level of seriousness that warrants the most severe penalty the law can inflict for that crime.[33] I have attached as an appendix the cases held in abeyance, both because the determination that they must be reviewed under the new rule created today identifies the pool of sentences whose potential reversal will be obscured by the abeyance process,[34] and because these cases, when reviewed

*Court Task Force on Gender Issues in the Court,* December, 1989, p 33.

[33] Cases in abeyance indicate similar unusual facts: In *People v Duncan,* No. 81333, the defendant, age eighteen, was convicted by a jury of first-degree criminal sexual conduct, armed robbery, and breaking and entering. The victim was an eighty-five-year-old woman who the defendant brutally raped and robbed at gunpoint, and who almost died as a result of the rape. The defendant's record contained a series of charges, including breaking and entering, assault and battery, felonious assault, and a history of substance abuse which began at the age of nine. When the jury returned a verdict of guilty, the defendant announced for the courtroom to hear, "If the judge gives me a long sentence, I'll be out in 20 years. I can still get it up and fuck some more."

In *People v Crawford,* No. 80889, the record reveals that the defendant, found guilty of assault with intent to murder, gunned down two police officers whom he knew were unarmed, murdered a young woman two days prior to this incident, had contacts with the police beginning at the age of eight, served ten separate jail terms, failed to complete two previous probation terms, had a history of assaultive behavior, including assaults of a teacher and his own brother, and who, after the jury announced a verdict of guilty, told the policewoman, whom he had shot in the face, that she would think of him every time she looked in the mirror.

[34] We observe that a number of the cases held in abeyance involve situations where the defendant pled guilty and apparently without objection interposed at the time of sentencing to any departure from the Sentencing Guidelines. While we have no occasion to express an opinion on this issue in the instant case, we observe that the Court has repeatedly held that a plea of guilty waives all nonjurisdictional defects. *People v Johnson,* 396 Mich 424; 240 NW2d 729 (1976), cert den 429 US 951 (1976).

on their merits, demonstrate how frequently the guidelines fail to reflect the seriousness of the crime or the offender's prior criminal history. As these cases illustrate, the deficiency is particularly striking in the assaultive crime groups.

In *People v Dumond,* No. 83669, under the 1984 guidelines minimum range, the maximum minimum was eight years for the defendant's conviction of armed robbery. However, the defendant had committed another armed robbery eleven days prior to the instant offense, and one of the victims was severely injured. His record included three prior felonies and evidence of heavy involvement with drugs, including information that the defendant made his living selling drugs. Further, the defendant had been last incarcerated from November, 1983, until sometime in August, 1984. Thus, less than six months transpired between his release and his commission of this offense. The judge imposed the life sentence authorized under the statute.

Another example of a situation where the sentence guidelines are simply inadequate to evaluate an individual who displays a lifelong pattern of increasingly serious criminal activity is *People v Goodson,* No. 84532. The defendant was charged with first-degree murder and was convicted of second-degree murder following a bench trial. This defendant, age eighteen, approached the victim outside a party, asked him what he was looking at, then drew his gun and shot the victim five or six times. At sentencing, the judge noted that what made this crime even worse was that, prior to the shooting, the defendant was told that the victim was not the person he had been looking for, that the victim tried to crawl around a tree to get away from his assailant, and that the defendant chased him around the tree and kept shooting.

Further, the record indicated few positive factors in this defendant's history: he had a lengthy juvenile record, which included two convictions of receiving stolen property over $100, fleeing and eluding, unarmed robbery, larceny from a person, and, as an adult, a plea of guilty of delivery of less than fifty grams of cocaine and failing to appear at the sentencing hearing. He had a history of substance abuse, and admitted he supported himself by trafficking in narcotics. Under the 1988 guidelines, the maximum minimum is twenty-five years, and the trial judge sentenced the defendant to seventy-five years.

These examples illustrate that the majority's conclusion that "the guidelines reflect the relative seriousness of different combinations of offense and offender characteristics" (*ante,* p 658), is unequivocally wrong. In fact, prior record variables for all offenses which are covered by the guidelines only account for up to four prior misdemeanor convictions, or two prior high-severity felony convictions, or two prior high-severity juvenile adjudications. Thus, where a defendant "goes off the grid," i.e., has a greater prior record than the grids can factor, the prior record variable factor in the guidelines cannot "reflect the relative seriousness of . . . offender characteristics." (*Ante,* p 658.) Two additional recent examples of cases in which leave was sought suffice to dramatize this point. In one, the defendant was convicted of breaking and entering an occupied dwelling and was sentenced to eight to fifteen years. Under the guidelines, the minimum range was twelve to thirty months *despite* the fact this was the defendant's fourth adult felony and fourteenth criminal misdemeanor.[35]

---

[35] *People v Reed,* No. 87015, leave to appeal denied April 24, 1990. The sentencing judge noted his frustration with the guidelines because they failed to adequately reflect the fact that by age twenty-

This is because the guidelines ignore all felonies beyond the first two and all misdemeanors beyond the first four.

In the second example, the defendant was convicted of armed robbery and first-degree criminal sexual conduct and was sentenced to sixty to ninety years. Under the guidelines, the minimum range was ten to twenty years. Once again, however, the guidelines range inadequately reflects the defendant's very lengthy record of eleven juvenile adjudications, one adult felony, one adult misdemeanor conviction, three prison escapes, numerous institutional misconducts, and his flight from Michigan after this offense.[36] Under the guidelines, the eleven juvenile adjudications are counted as four if they are high-severity offenses and two if of low severity. In effect then, even though the guidelines purport to consider prior offenses, they compel the sentencing judge to ignore the remaining juvenile adjudications.[37]

Thus, a defendant who has twenty high-severity convictions is treated under the grids as if he had two such convictions, and a defendant who has

eight this defendant had been to prison once, to jail fourteen times, placed on probation three times and was once again before the court for his fourth felony.

[36] *People v Ferguson,* No. 86503, pending application for leave to appeal. Defendant's criminal career began at age nine with the breaking and entering of an occupied dwelling. As a juvenile, he accumulated four or five more breaking and entering petitions, several larcenies, an armed robbery, an assault with intent to rob while armed, and a felonious assault.

[37] In *People v Michaels,* No. 87122, leave to appeal denied April 24, 1990, the defendant pled guilty of the offense of obtaining funds over $100 by false pretenses and received a sentence of five years, ten months to ten years. He was initially charged with uttering and publishing for writing a $1500 check for cash on his own closed account. Under the guidelines the minimum range was six months to twenty-four months in prison. The sentencing judge correctly noted the suggested guideline term was insufficient to reflect defendant's four prior felonies and three misdemeanors.

Thus, the guidelines force the sentencing judge to ignore all of defendant's felonies beyond the first two.

been twice convicted of larceny from the person is treated the same as a person who has ten prior rape convictions. Fifty points are the statistical universe of the grids. But the universe of individuals cannot be contemplated by any statistical grid, and until today we have never suggested that the guidelines correctly weigh the factors within the grids.[38]

*People v Winchell,* No. 84332, is a final example of a case in which the guidelines are inadequate to evaluate the degree of severity of the defendant's conduct. The defendant was convicted by a jury of first-degree criminal sexual conduct involving his stepdaughter. The guidelines do not take into consideration that the defendant sexually abused the victim almost daily over a two-year period, beginning when she was twelve years old.[39] Or, as a trial judge noted, when sentencing a defendant without a prior felony on his record to a minimum term of forty years for first-degree criminal sexual conduct involving a four-year-old victim,

> [the sentencing guidelines do not take into account the] actual tearing of this child's hymen [or that]

---

[38] In fact, after removing the cases in which minimum sentences are required by statute, sixty-five percent of the grids require no time at all to be served by a defendant.

[39] Compliance with the 1984 guidelines is no measure of a correct sentence. For example, in *People v Lopez,* No. 84690, the facts and presentence report reveal that the defendant pled guilty of one count of first-degree criminal sexual conduct involving a twelve-year-old girl, the daughter of the woman with whom he boarded, in exchange for the prosecutor's promise to dismiss five additional counts of first- and second-degree criminal sexual conduct. These charges arose out of a series of sexual assaults involving this complainant and her nine-year-old sister, whom the defendant took care of while the mother worked at night, including threats to kill the victims' mother if they told anyone about the assaults. Under the 1984 guidelines, the maximum minimum is fifteen years; the trial judge sentenced the defendant to a minimum term of twenty-five years, and under the 1988 guidelines, the maximum minimum is twenty-five years.

[t]he child continues to have nightmares . . . how
many rapes of babies [is a person allowed]?[40]

Neither the Legislature nor this Court, in promul-
gating the guidelines, purported to know the an-
swer to that agonizing question.

## SUMMARY

The majority's "objective" approach and propor-
tionality analysis is a *trompe l'oeil* for the asser-
tion of its subjective assessment of excessive pun-
ishment. I believe that the true motivation of the
majority is the belief that the Court's guidelines
are a worthwhile project that is now in danger of
being discredited by a few judges who upwardly
depart from the guidelines, for reasons the major-
ity believes are not legitimate. The concern of the
majority may be that if a vehicle is not found to
rein in these judges, the number of judges willing
to flout the guidelines will increase because guide-
lines will no longer be seen as authoritative.

Notwithstanding this legitimate concern, I be-
lieve we are entitled to assume that trial judges
will fulfill their oaths of office and continue to
adhere to the administrative order because they
are obliged to follow it, unless in good faith and
good conscience they cannot. If this means that
some few judges cannot be "controlled," then that
is the price of democracy, a far less institutionally
destructive price to pay than permitting the few
judges who habitually depart from guidelines to
handcuff the overwhelming majority of trial judges
who do not. Indeed, if we attempt to deal with the
problem by too rigidly confining discretion, we
may hasten the demise of guidelines by providing
a platform for those who, speaking on behalf of an

40 See *People v Walters,* No. 85707.

aggrieved defendant or an aggrieved public, would call into question all that the guidelines have tried to accomplish.

The truth is that this Court has no statistical basis for concluding that a substantial departure from sentencing guidelines, up or down, indicates that a trial judge has imposed an arbitrary sentence. And the truth is that a definitive standard for "meaningful" review of discretionary sentences cannot be articulated because the variety and effect of both man's inhumanity to man and man's capacity for redemption cannot be encompassed in statistical categories or evaluated from the printed page.

When all else is said and done and guilt has been determined, a defendant stands before the court for sentence. At that moment no trial judge can be indifferent to the vulnerability and isolation of the human being who awaits that pronouncement. Every judge who has ever had to pronounce sentence knows that the act requires moral courage; the courage to grant leniency to a deserving defendant despite community feeling or victim outrage, or the courage to deprive the defendant of his liberty and his family of their loved one for a substantial period of time when the situation demands it. The unavoidable reality of the human context to which the judge must apply his legal, moral, and factual experience in evaluating the defendant, the act, and its human consequences, is the backbone in that process.

### CONCLUSION

Sentence guidelines are a worthwhile project designed to focus the sentencing court on objective factors as a screening device to protect against arbitrary sentences. The fact that all sentences are

not predictable neither justifies condemnation of the trial judiciary, nor establishes the right of this Court to determine the appropriate punishment for particular offenses.

The majority's holding that this sentence is unlawful, although neither cruel nor shocking but merely "unusual," is an indictment of the sentencing judge. To presume that such a sentence is arbitrary, despite evidence in support of the trial court's conclusion, is a resounding vote of "no confidence" in the ability of trial judges to operate in a fundamentally fair manner.

Most importantly, although the majority disputes my observation that departures may be risked only on pain of reversal, it does so by observing that sentences *within* guidelines may also not be proportional to the seriousness of the matter and that sentences for crimes not included in guidelines are also reversible under the principle of proportionality, *ante,* p 661, n 29, all without telling the trial judiciary how they are to determine proportionality, other than that a sentence may not be too high (or too low). With all due respect, since no guidance has been given as to how the standard is to be applied, this opinion is simply an invitation for appeals and reversals of sentences.[41]

I would affirm the judgment below.

RILEY, C.J., concurred with BOYLE, J.

[41] The majority's statement of the applicability of today's decision extends to currently pending first appeals in which the appellant's initial brief has not been filed and appeals filed after the date of this decision. Thus, the majority holds that a defendant who pleads guilty and who interposes no objection at sentencing, or a prosecutor who remains silent while sentence is imposed, has not waived the issue on appeal. I can think of no clearer stimulation in recent memory for the wholesale escalation of claims of appeal. Even if I agreed with today's result I could not concur in such a remarkable emasculation of the obligation to preserve error below. Without such limitation every sentence is an invitation to blindside the trial judge.

**APPENDIX A**

CASES BEING HELD IN ABEYANCE FOR *PEOPLE v MILBOURN*:

Offense—Crime for which defendant is sentenced
Statute—Legislatively-mandated sentence
'84 Min—Mandatory Minimum - 1984 Guidelines
'88 Min—Mandatory Minimum - 1988 Guidelines
Sentence—Sentence imposed by the trial judge
/-DC   —Minimum, minus disciplinary credits

| Docket No. | Offense | Statute | '84 Min /-DC | '88 Min /-DC | Sentence /-DC |
|---|---|---|---|---|---|
| *Hughes* 81153 | Assault/w Int Mrd (bench) | Life | 20 yrs/ 16y 2m 28d | 15 yrs/ 12y 2m 6d | 40 yrs/ 32y 6m 2d |
| *Squires* 81985 | CSC-2nd (jury) | 15 yrs | 3 yrs/ 2y 5m 4d | 8 yrs/ 6y 5m 26d | 10 yrs/ 8y 1m 14d |

| Docket No. | Offense | Statute | '84 Min /-DC | '88 Min /-DC | Sentence /-DC |
|---|---|---|---|---|---|
| Winchell 84382 | CSC-1st (jury) | Life | 10 yrs/ 8y 1m 14d | 10 yrs/ | 20 yrs/ 16y 2m 28d |
| Rizzi 81919 | CSC-1st (plea) | Life | 10 yrs/ 8y 1m 14d | 20 yrs/ 16y 2m 28d | 35 yrs/ 28y 5m 11d |
| Lopez 84690 | CSC-1st (plea) | Life | 15 yrs/ 12y 2m 6d | 25 yrs/ 20y 3m 27d | 25 yrs/ |
| Crawford 80889 2 trials | Asslt/Mur (jury) | Life | Life | Life | #1-Life #2-65 yrs/ 52y 29m 30d |
| Goodson 84532 | Mur-2nd (bench) | Life | 18 yrs/ 14y 7m 16d | 25 yrs/ 20y 3m 27d | 75 yrs/ 60y 11m 20d |

| Docket No. | Offense | Statute | '84 Min /-DC | '88 Min /-DC | Sentence /-DC |
|---|---|---|---|---|---|
| Payton & Rowell 83149 | RA (plea) RA (plea) | Life " | 2 yrs/ 1y 7m 12d " | 4 yrs/ 3y 2m 24d " | 10 yrs/ 8y 1m 14d 8 yrs/ 6y 5m 26d |
| Boucha 82173 | RA (plea) | Life | 2 yrs/ 1y 7m 12d | 4 yrs/ 3y 2m 24d | 15 yrs/ 12y 2m 6d |
| Duncan 81333 | CSC-1st (jury) | Life | 15 yrs/ 12y 2m 6d | 25 yrs/ 20y 3m 27d | 125 yrs/ 101y 7m 13d |
| Micou 83047 | Consprcy RA (plea) | Life | N/A | N/A | 60 yrs/ 48y 9m 8d |
| Dumond 83669 | RA (jury) | Life | 8 yrs/ 6y 5m 26d | 25 yrs/ 20y 3m 27d | Life/ 10y |
| Cummings 82704 | RA (jury) | Life | 3 yrs/ 2y 5m 4d | 8 yrs/ 6y 5m 26d | 20 yrs/ 16y 2m 28d |

| Docket No. | Offense | Statute | '84 Min /-DC | '88 Min /-DC | Sentence /-DC |
|---|---|---|---|---|---|
| Hawkins 81703 | Asslt/w Int Mrd (jury) | Life | 2 yrs/ 1y 7m 12d | 4 yrs/ 3y 2m 24d | 18 yrs/ 14y 7m 16d |
| Clardy 84726 | B & E (plea) | 10 yrs | 2 yrs/ 1y 7m 12d | 4 yrs/ 3y 2m 24d | 6 yrs/ 4y 10m 12d |
| Smith 85038 | RA (jury) | Life | 4 yrs/ 3y 2m 24d | 6 yrs/ 4y 10m 12d | 20 yrs/ 16y 2m 28d |
| Salski 83678 | Larceny flse pret (plea) | 10 yrs | 1 yr/ 9m 21d | 1 yr/ | 6yrs 6m/ 5y 3m 9d |
| Lawrence* 81954 | Arson (plea) | 4 yrs | 3 mos | 10 mos/ 7m 30d | 13 mos/ 9m 21d |
| Finley 83310 | Drugs < 50 grm (plea) | 20 yrs | 3yrs 6m/ 2y 9m 29d | 1 yr/ 9m 21d | 10 yrs/ 8y 11m 6d |

| Docket No. | Offense | Statute | '84 Min /-DC | '88 Min /-DC | Sentence /-DC |
|---|---|---|---|---|---|
| Johnson** 84777 | Drugs < 50 grm (plea) | 20 yrs | 1 yr/ 9m 21d | 2 yrs/ 1y 7m 12d | 10 yrs/ 8y 11m 6d |
| Luckey 85225 | CSC-1st | Life | 10 yrs/ 8y 1m 14d | 10 yrs/ | 40 yrs/ |
| | CSC-2nd (jury) | 15 yrs | 3 yrs/ 2y 5m 4d | 8 yrs/ 6y 5m 26d | 10 yrs/ 8y 1m 14d |
| Kurtz 85049 | Drugs < 50 grm (plea) | 20 yrs | 1 yr/ 9m 21d | 2 yrs/ 1y 7m 12d | 5 yrs/ |
| Melendez 85458 | Drugs > 225 grm < 650 grm (jury) | 30 yrs | 1 yr/ 9m 21d | | 20 yrs/ |
| Haymer 85824 | RA (plea) | Life | 8 yrs/ 6y 5m 26d | 8 yrs/ | 30 yrs/ 24y 4m 20d |

| Docket No. | Offense | Statute | '84 Min /-DC | '88 Min /-DC | Sentence /-DC |
|---|---|---|---|---|---|
| *Powell* 85747 | RA/2 counts (jury) | Life | 6 yrs/ 4y 10m 12d | 5 yrs/ 4y 0m 22d | 20 yrs/ 16y 2m 28d |
| *Long* 85609 | RA/2 counts (plea) | Life | 6 yrs/ 4y 10m 12d | 6 yrs/ | 20 yrs/ 16y 2m 28d |
| *Walters* 85707 | CSC-1st (jury) | Life | 6 yrs/ 4y 10m 12d | 10 yrs/ 8y 1m 14d | 40 yrs/ 32y 6m 2d |

* (has been released)
** (originally put on probation)

APPENDIX B

The following are among the cases held in abeyance pending the decision in *People v Milbourn:*

CRIMINAL SEXUAL CONDUCT

*People v Squires,* Docket No. 81985: On November 19, 1985, the defendant, age 76, was convicted of two counts of second-degree criminal sexual conduct (CSC II) with two children, ages six and seven. He had previously been convicted for accosting, enticing, and soliciting a child under sixteen for immoral purposes and placed on two years probation in 1982.

At sentencing the trial judge noted the defendant's prior similar-type charge and that he had been advised to avoid any contact with other small children after that conviction in 1982. In addition the mother of one of the victims related that her daughter has suffered an emotional effect as a result of coming into contact with the defendant. She has hot and cold flashes, still has nightmares, is apathetic, and doing poorly in school since the molestation.

At sentencing the trial judge noted that the guidelines were totally inadequate to address the kind of problem this defendant represented in the community, concluding that the defendant's pattern of enticing small children, the heavy emotional effect on the victim, and that the victims were so young justified a lengthy incarceration.

The maximum term authorized under the statute was 15 years. MCL 750.520c(1)(a); MSA 28.788(3)(1)(a). The guidelines minimum range was 0 to 36 months, and under the 1988 revised guidelines is 2 to 8 years. The defendant was sentenced

to 10 to 15 years. As a Proposal B offender his minimum sentence is 10 years minus disciplinary credits, which is 8 years, 1 month and 14 days.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for a repeat sexual offender is three years minus disciplinary credits or 2 years, 5 months and 4 days. If the 1988 guidelines govern, the sentence is 8 years minus disciplinary credits or 6 years, 5 months and 26 days.

*People v Winchell,* Docket No. 84332: On March 20, 1987, the defendant, age 48, was convicted by a jury of first-degree criminal sexual conduct involving his stepdaughter, who he sexually abused almost daily over a two-year period, beginning when she was twelve until she was fourteen years old. The defendant did not have a prior criminal record but did exhibit a consistent pattern of mental and physical abuse toward each of the six women he had been married to and, to a lesser extent, his children and stepchildren.

At sentencing, the judge specified on the record that the departure from the guidelines was based on the predatory nature of the crime. He noted that the defendant was three to four times older than the victim and that he was in a position of a quasi-father. Further, the court found the victim to be a fourteen-year-old who generally acted her age, not a young teenager who acted like a twenty-year-old. She was not worldly, and the physical and emotional damage were scars she was likely to have for a long time. In order to protect society and deter future criminal sexual conduct by the defendant, the trial judge decided that this defendant must be isolated until he could become a proper member of society.

The maximum term under the statute for CSC I

is life, or any term of years. The guidelines minimum range was 6 to 10 years, and under the 1988 revised guidelines is 5 to 10 years. The defendant was sentenced to 20 to 40 years, and as a Proposal B offender will serve approximately 16 years, 2 months and 28 days.

Using the maximum minimum under the guidelines, the mandatory minimum sentence for a child sex abuser is 10 years minus disciplinary credits or 8 years, 1 month and 14 days.

*People v Rizzi,* Docket No. 81919: On June 2, 1986, the defendant, age 17, pled guilty of two counts of first-degree criminal sexual conduct, one count of third-degree criminal sexual conduct, and unarmed robbery relating to two separate incidents.

One offense took place in November, 1984, when the defendant robbed and raped a woman at the gas station where she was employed. The defendant hit the victim on the back of the head, forced her into the back of the building, ordered her to remove her clothing telling her he had "nine inches for her," and then raped her. He forced her to open the safe and took bags of money, telling her he would kill her and beat her badly if she did not do what she was told.

Another offense took place in October, 1984, when the defendant broke into a home through the bedroom screen and raped the daughter who was sleeping in that room. The defendant told the girl that he had seen her around, that he intended to "fuck her" and that she should lay back and enjoy herself. The defendant also told the victim that she had better do what he told her because his friend was waiting outside with a gun.

The presentence report notes that the first victim was interviewed in 1986, and stated she was

still emotionally upset over the incident. She is terrified of being assaulted again. The second victim stated that she is still terrified when she is alone at night that someone is going to get her.

At sentencing, the judge noted that although the defendant had no prior record, extensive information developed at the juvenile court hearings indicated that the defendant could be irreparably dangerous and disturbed. The defendant related that he began using marijuana at the age of twelve and since then, until his arrest, used it approximately twice a week and drank one or two six-packs of beer every day. He further noted that the court had to consider that there were five separate criminal acts committed with regard to the same victim in one of the cases, that this was this defendant's second violent crime within a seven-day period, and that the defendant threatened to shoot one of the victims and ordered her into a cooler. The judge did not calculate into the guidelines a separate incident of an attempted assault on a third woman which was interrupted before the defendant could succeed in his actions.

The maximum penalty for csc i is life and for unarmed robbery and csc iii is 15 years. The guidelines minimum range for csc i was 6 to 10 years, and under the 1988 revised guidelines is 8 to 20 years. On August 8, 1986 the defendant was sentenced to 35 to 80 years for the csc i convictions and 10 to 15 years on the remaining convictions. As a Proposal b offender the defendant will serve approximately 28 years, 5 months and 11 days.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for a repeat sexual offender is 10 years minus disciplinary credits or 8 years, 1 month, and fourteen days. If the 1988 guidelines govern, the sentence is

20 years minus disciplinary credits or 16 years, 2 months and 28 days.

*People v Lopez,* Docket No. 84690: On March 18, 1987, the defendant, age 29, pled guilty of one count of first-degree criminal sexual conduct. Pursuant to a plea agreement, the prosecutor agreed to the dismissal of three additional counts of first-degree criminal sexual conduct and two counts of second-degree criminal sexual conduct.

The counts arose out of a series of sexual assaults committed between October, 1980, and early September, 1981, with two girls, ages 9 and 12. The victims' mother had allowed the defendant to move into their home because he needed a place to live and she needed someone to babysit while she worked at night.

On April 22, 1987, the defendant was sentenced to 25 to 60 years. The judge noted the reasons he had departed from the guidelines: the defendant had threatened to kill the child-victim's mother if the victim told of the assault; he had assaulted the victim's sister as well; the children suffered psychological damage; and the guidelines were too low for this offense.

The Court of Appeals affirmed the trial court's decision, noting the seriousness of sexually abusing a child, particularly where the offender lived in the child's home and was trusted by her; that the abuse occurred on more than one occasion; that the defendant failed to recognize and appreciate the depth of his problem, and that a lengthy prison term was necessary to adequately discipline this defendant.

The maximum penalty for first-degree criminal sexual conduct is life, or any term of years. The guidelines minimum range was 96 to 180 months, under the 1987 proposed revisions was 180 to 300

months, and now under the 1988 revised guidelines is 120 to 300 months, or 10 to 25 years.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for a repeat sexual offender is 15 years minus disciplinary credits or 12 years, 2 months and 6 days. However, if the 1988 guidelines govern, the sentence is 25 years minus disciplinary credits or 20 years, 3 months and 27 days. In this case, the sentence of 25 to 60 years imposed by the judge is not a departure from the minimum range under the 1988 guidelines.

*People v Luckey*, Docket No. 85225: On September 21, 1987, the defendant, age 24, was convicted by a jury of two counts of first-degree criminal sexual conduct and one count of second-degree criminal sexual conduct for having sexually assaulted his girl friend's nine-year-old daughter.

Although the victim told her mother and aunt about the sexual assaults within a month after the first occurrences, nothing was done until the victim told her principal at school about the incidents. She was taken from her home by protective services and placed in a foster care home. A medical examination performed on September 12, 1986, revealed that the victim had a ruptured hymen and approximately thirty venereal warts around the opening of her vagina.

At trial, the mother and aunt testified that they did not do anything when the victim told them what the defendant had done to her because they could not believe it. The defendant also testified, denying the incidents ever took place.

At sentencing, the trial judge imposed a 40- to 80-year prison sentence for each first-degree criminal sexual conduct count and 10 to 15 years for the second-degree criminal sexual conduct. The

judge noted that the family surroundings were reprehensible, i.e., the victim's mother had been sexually abused and did not take care of her own daughter, the victim in the present case. The defendant, however, certainly could not be excused for his behavior in taking advantage of an 8-year-old child, "a little girl who is totally helpless." Further, the judge emphasized that she wanted the Court of Appeals to understand why she exceeded the guidelines, that the reviewing court understand that everyone who was present in the courtroom for the trial was appalled, and that a little girl's life was ruined.

The presentence report contained information that the defendant admitted daily use of marijuana, was adjudicated for indecent exposure in 1979, was convicted of possession of marijuana in 1972, and larceny in 1985, and that there was an outstanding warrant for his failure to appear on another charge of possession of marijuana.

Further, the complaint filed in 1979 included a count for first-degree criminal sexual conduct and one for second-degree criminal sexual conduct arising out of an incident in which a witness reported seeing the defendant rubbing his penis against the buttocks of two female children, ages 6 and 3, who were playing in the backyard of a home where the defendant was cutting the grass. The defendant was warned, and the petition was dismissed.

The statute authorized a maximum penalty of life for the counts of first-degree criminal sexual conduct and 15 years for second-degree criminal sexual conduct. Under the 1984 guidelines, the minimum range was 8 to 15 years, and under the 1988 guidelines it is 10 to 25 years.

*People v Walters,* Docket No. 85707: The defendant, age 28, was charged with and convicted by a

jury of first-degree criminal sexual conduct involving a 4-year-old girl.

The defendant was the boyfriend of the woman who babysat for the victim while her mother worked. The victim testified that she was sleeping at the babysitter's house when the defendant came into the bedroom, shook the bed to wake her up, took off her pajamas, and put his thing into her. The victim said she told the defendant to get off her and slapped him.

The victim's mother testified that her daughter told her of the incident about a week later when she complained to her mother that she hurt, and that "Michael . . . [had] mess[ed] with [her] down there." The doctor who examined the victim testified that there was swelling in the victim's vaginal area, that her hymen was not intact, and that she had been traumatized. As a result of the offense, the victim has suffered nightmares and is afraid to sleep alone. The defendant took the stand and denied any sexual assault of the victim.

The presentence report contained very little information concerning the defendant. Although it appeared the defendant had no prior record, the individual who prepared the report stated that it was believed that the defendant made a deliberate effort to conceal truthful information about himself. Thus, it would be difficult to supervise him in the community if he were placed on probation.

The defendant stated he was usually employed. However, when an attempt was made to verify the information he provided regarding his employment, no place the defendant had listed had any record of his having worked there. The defendant also reported that he was graduated from Cass Technical High School, yet the school had no record of defendant ever attending.

At sentencing the judge noted that the sentenc-

ing guidelines do not take into account the actual tearing of a child's hymen, or of a child's continuing to have nightmares. Further, while the judge recognized that the defendant did not have a prior record, he also questioned "how many rapes of babies [is a person allowed]?"

The maximum term under the statute is life imprisonment, under the 1984 guidelines the maximum minimum was six years, and under the revised guidelines it is ten years. The judge sentenced the defendant to a minimum term of forty years.

HOMICIDE

*People v Crawford,* Docket No. 80889: The defendant is currently serving sentences of life for first-degree felony murder, assault with intent to murder, armed robbery and three 2-year terms for possession of a firearm during the commission of a felony. Some of these convictions arose out of an armed robbery and assault committed on January 6, 1981, during which the defendant murdered a young woman by shooting her and then repeatedly stabbing her with a butcher knife. The defendant, age 29, was sentenced to life without parole.

However, the appeal before the Court arises out of an incident which occurred on January 9, 1981, three days after the above offense. The defendant shot two police officers at the Hall of Justice in Grand Rapids when he was approached concerning an outstanding warrant for malicious destruction of property over $100 and felonious assault in a Wyoming incident.

The three vice officers had been alerted by a judge that the defendant would be in his courtroom that afternoon posting bond for a friend.

After the court proceedings were over and the police approached the defendant, he pulled out his gun. Not one of the three police officers was armed and all held out their arms at their sides to indicate that fact to the defendant. They told the defendant they would not stop him from leaving. As the defendant approached the door to leave and the officer closest to that door remained standing away from the exit with her arms still held out at her sides, the defendant, approximately 4 feet away, raised and extended the revolver and fired one shot into her face. He then leaned forward and fired a second shot into her chest area.

One officer ran out of the courtroom to get help and weapons. He was unable to acquire a gun but was able to find two armed officers who headed back to the courtroom with him. However, as the officer ran back, he suddenly found himself unarmed, face to face with the defendant without any backup. He was unaware the others had stopped to investigate yelling that someone had seen the defendant at the other end. The defendant shot this officer in the clavicle area of his right shoulder. The defendant was finally apprehended, and it was discovered the gun he was using had been taken from the scene of the robbery-murder of three days earlier. When the defendant was interviewed, he did indicate he was carrying a revolver that day, but remembered nothing else. He showed no remorse or concern about the victims of the shootings.

The defendant's contacts with police began at age 8 and have continued until the time he was imprisoned at age 29. He has served one prison term and at least ten separate jail terms. Convictions include the offenses of attempted armed robbery, larceny from a building, possession of marijuana, larceny, disorderly conduct, and ab-

sconding on bond. He also completed one term at Boys Training School as a juvenile and failed to complete two previous probation terms.

On December 9, 1981, the defendant was convicted by a jury of two counts of assault with intent to murder, carrying a concealed weapon and possession of a firearm during the commission of a felony. The maximum penalties are, respectively, life, 5 years, and 2 years. The guidelines minimum range was 15 years to life, and under the 1988 revised guidelines is 15 to 25 years or life. The defendant was originally sentenced to two terms of life for the assault convictions. However, the Court of Appeals reversed the convictions on the ground that the jury had not been properly instructed. The defendant was convicted by a jury at the second trial for the same offenses.

At sentencing, the judge considered the defendant's juvenile record and his assaultive behavior which started at an early age. The judge noted charges against the defendant for an assault, assaulting a teacher in school, aggravated assault, felonious assault of a brother with a shotgun, and an arson of an automobile, all occurring before the defendant was 17 years old. The judge believed that the defendant was not only dangerous, but that he had little or no remorse for his actions, noting the defendant told the policewoman whom he shot in the face, after the jury came back with the guilty verdict, that every time she looked in the mirror she would have to think of him. In addition, the judge noted that when the instant offense took place, the defendant had already killed one person, and attempted to kill three other people, all in about a three-, four-, or five-day period.

While the court was aware that the defendant

was presently serving a first-degree murder sentence, the defendant was sentenced to 65 to 100 years for the assaults, to be served concurrently, 2 years for felony-firearm, and 3 to 5 years for carrying a concealed weapon, to be served consecutively to the terms of 65 to 100 years. If these were the only offenses for which the defendant was in prison he would be eligible for parole in approximately 51 years.

Using the maximum minimum under the guidelines, the mandatory minimum for assault with intent to murder is life. As such, this defendant's minimum sentence of 65 years does not constitute a departure from the guidelines minimum range. This is an example of a case which the Court intended to hold in abeyance for *People v Moore.* The Court cannot invalidate the sentence under *Milbourn* because it is within the guidelines.

*People v Goodson,* Docket No. 84532: The defendant, age 18, charged with first-degree murder and felony-firearm, was convicted of second-degree murder and felony-firearm following his bench trial. The underlying incident occurred on October 17, 1986, at a party when the defendant followed the victim, age 19, and some of his friends outside. The defendant approached the victim, asked what he was looking at, pulled out a gun, and shot the victim. When the victim tried to crawl behind a tree, the defendant followed him and shot him five more times.

At sentencing, the judge noted that it appeared the reason for the shooting was perhaps a mistaken identity and yet right before the shooting the defendant was told the deceased was not the person he assumed it was. He noted it made it even worse that the defendant found it insufficient to shoot the victim one time; instead he actually

chased him around the tree and shot him four more times.

The presentence report indicated few positive factors in the defendant's history. It noted a juvenile record which included two convictions for receiving stolen property over $100, fleeing and eluding, unarmed robbery, larceny from a person, and a violation of probation. As an adult the defendant pled guilty of delivery of less than 50 grams of cocaine and then failed to appear for sentencing. The records indicated a lack of supervision in the home and that the offender's mother had moved to Pittsburgh and left the children in Detroit. The defendant, age 18, already had a long history of substance abuse, and he admitted he supported himself by trafficking in narcotics.

The statute authorizes imprisonment for life or any term of years. MCL 750.317; MSA 28.549. The guidelines minimum range was 8 to 18 years, and under the 1988 guidelines is 10 to 25 years. The defendant was sentenced to 75 to 150 years.

Using the maximum minimum under the 1984 guidelines, the mandatory minimums, the mandatory minimum sentence for a defendant convicted of second-degree murder is 18 years minus disciplinary credits, or 14 years, 7 months and 16 days. If the 1988 guidelines govern, the sentence is 25 years minus disciplinary credits, or 20 years, 3 months and 27 days.

ASSAULT WITH INTENT TO MURDER

*People v Hughes,* Docket No. 81153: On November 15, 1985, following a bench trial, the defendant, age 18, was sentenced to 40 to 80 years in prison for the underlying offense of assault with intent to commit murder, plus 2 years on the felony-firearm offense. At trial, the evidence estab-

lished that on August 28, 1985, the defendant fired a handgun from a passing car approximately six times into a group of youths near Pershing High School in Detroit. Two of the shots hit one of the youths, a 13-year-old boy, in the arm and in the back. Although the bullet hit him in the back and went through his kidney, the victim eventually recovered.

At trial, the sentencing judge explained on the record, his departure from the sentencing guidelines in great detail. He stated that the guidelines were totally inadequate, and that it was clearly the defendant's intention to place everyone in the group he shot at in a high degree of risk of death. Further, he noted that the shot easily could have severed the spine of the victim rather than hitting the kidney.

The maximum sentence authorized under the statute was life imprisonment. The maximum minimum under the 1984 guidelines was twenty years and under the 1988 revised guidelines is fifteen years imprisonment.

**ROBBERY**

*People v Payton, People v Rowell,* Docket No. 83149: On July 29, 1986, the defendants, both age 18, pled guilty of one armed robbery count in exchange for dismissal of the other count of armed robbery and two counts of felony-firearm with which they were originally charged.

The charges arose out of two robberies the defendants committed within a half-hour on May 6, 1986, in Flint. Defendant Payton provided and held the pistol during both robberies. The victim of one of the robberies stated that since the robbery he has suffered nightmares and severe anxiety.

At sentencing, the judge expressed concern that

defendant Payton had committed two armed robberies in one night and attempted to flee the police when they sought to apprehend him. Further the defendant was the instigator in the offense and the one that provided the weapon. He also noted the personal suffering imposed upon the victim.

In regard to Rowell, the judge acknowledged that while this defendant was not as significant a factor in the robbery because he did not carry the gun, he also had run when the police came to apprehend him, and, further, that the court could not ignore the fact that Rowell participated in two armed robberies in one night.

The statute authorizes imprisonment for life or any term of years. The guidelines' recommended minimum was 18 to 24 months, and under the 1988 revised guidelines is 1 to 4 years. Defendant Payton was sentenced to 10 to 20 years, and defendant Rowell to 8 to 20 years. As Proposal B offenders Payton will serve approximately 8 years, 1 month and 14 days, and Rowell, 6 years, 5 months and 26 days.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for armed robbery is 2 years minus disciplinary credits, or 1 year, 7 months and 12 days. If the 1988 guidelines govern, the sentence is 4 years minus disciplinary credits, or 3 years, 2 months and 24 days.

*People v Boucha,* Docket No. 82173: On November 19, 1984, the defendant, age 31, pled guilty of an armed robbery, in exchange for which the Eaton County and Ingham County prosecutors agreed to dismiss pending charges of armed robbery and felony-firearm in Ingham County, and a related felony-firearm charge from the Eaton County robbery. This defendant's only prior con-

tact with the criminal justice system was in 1974 when he was convicted of simple larceny.

The defendant maintained his involvement in the instant offense was precipitated by marital difficulties and his subsequent involvement in the use of illegal drugs. He admits he has a serious substance abuse problem and needs help. He related that the divorce of his mother and father at an early age caused him much trauma, both because of the loss of his father and the amount of responsibility he was forced to assume when he was young.

At sentencing, the trial judge noted that the reason he planned to depart from the guidelines minimum range was that the defendant admitted to two robberies in which he used a loaded gun, which indicated the defendant was prepared to kill. The statute authorized a sentence of life or any term of years. The guidelines minimum range was 18 to 24 months, and under the 1988 revised guidelines is 1 to 4 years. The defendant was sentenced to 15 to 25 years, and will serve approximately 12 years, 2 months and 6 days.

If the 1984 guidelines are the maximums, the mandatory minimum sentence for a repeat armed robbery offender is 2 years minus disciplinary credits or 1 year, 7 months and 12 days. If the 1988 guidelines govern, the sentence is 4 years minus disciplinary credits, or 3 years, 2 months and 24 days.

*People v Duncan,* Docket No. 81333: On December 9, 1985, the defendant, age 18, was convicted by a jury of first-degree criminal sexual conduct, armed robbery, and breaking and entering. The victim was an 85-year-old woman who the defendant robbed and raped at gunpoint. He then tied her up and warned her he would be back. She

was able to break free and call the police. When they arrived she was bleeding profusely, and it was believed she would not survive the rape.

The victim submitted a statement in which she noted that since the crime she has been forced to vacate her home, selling it for a fraction of the cost, and had to use all her life savings to buy another small house. Her health has suffered as a direct result of injuries sustained during the rape, and her weight has dropped from 119 to 99 pounds.

The defendant was a chronic truant while in school, and from 1980 through 1982, various complaints, including assault and battery, breaking and entering, arson, and curfew violations, were filed against the defendant. Most of these incidents involved neighbors and some refused to prosecute after filing the charges. The defendant was convicted in 1983 of unlawful driving away of an automobile, of breaking and entering an occupied dwelling, and armed robbery when he was 16. In 1985, a felonious assault charge was filed against the defendant, but the witness refused to testify. The defendant admits a history of substance abuse involving everything except heroin and that he has used marijuana constantly since he was 9 years old.

At sentencing, the judge noted the brutal conduct of the defendant, and the cruelty inflicted upon the victim. He also noted that the defendant was an individual who had started with substance abuse problems at age 9, had ongoing problems as a juvenile, had been on probation, sent to Boysville and, finally, to Boys Training School from where he was released in May of 1985. Within 6 months the defendant was back in court for the instant offense.

The trial judge also discussed the remark that

the defendant had made after the jury returned the verdict, which was "If the judge gives me a long sentence, I'll be out in 20 years. I can still get it up and fuck some more." This remark was, as the judge noted, consistent with the defendant's rather disinterested, cavalier attitude throughout the proceedings.

The statutes authorize sentences of life for both criminal sexual conduct and armed robbery, and 15 years for breaking and entering. The guidelines minimum range was 8 to 15 years for the csc i and 5 to 8 years for the breaking and entering, and under the 1988 revised guidelines, is 10 to 25 years for the csc i and 5 to 15 years for the breaking and entering. The defendant was sentenced to concurrent terms of 125 to 150 years, 50 to 100 years, and 10 to 15 years.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for a first-degree sexual offender is 15 years minus disciplinary credits, or 12 years, 2 months and 6 days, and for the breaking and entering offense is 8 years minus disciplinary credits, or 6 years; 5 months, and 26 days. If the 1988 guidelines govern, the sentences are 25 years minus disciplinary credits, or 20 years, 3 months, and 27 days for the csc i, and 15 years minus disciplinary credits, or 12 years, 2 months and 6 days for the breaking and entering.

*People v Micou,* Docket No. 83047: On June 29, 1983, the defendant, age 30, was convicted of conspiracy to commit armed robbery. The defendant was originally charged with first-degree murder, conspiracy to commit murder, and armed robbery.

Prior to trial, defendant's coconspirators related that they originally planned to rob the victim, and

when the three of them went to the victim's house the first time, they left because he was not alone. When they returned, the defendant shot the victim through the glass in the front door when he · lifted the shade to see who was there. However, at trial the other men said they did not know who shot the victim.

The defendant's juvenile record contained prior probation with the Wayne County Juvenile Court for possession of a motor vehicle. His first conviction as an adult occurred on June 1, 1972, when he was charged with the unauthorized taking and using of a motor vehicle. In 1977, the defendant was sentenced to two terms of prison, one for receiving and concealing stolen property and the other for arson.

The defendant freely admitted he was an arsonist and had been paid to burn down people's property in return for ten percent of what the insurance paid. He also admitted to selling stolen property as well as being a drug trafficker since he was about 13 years old. He also told of a time in 1967, when, at age 15, he was a heroin addict and would do whatever he had to in order to support his habit.

The defendant pleaded guilty to the conspiracy charge, and was sentenced to 60 to 200 years. This Court remanded for resentencing before a different judge on the basis that the remarks at the sentencing came close to being a finding of guilt of the crime of murder for which the defendant was not convicted.

At the resentencing hearing, the judge noted the defendant's four prior felonies, and that he was an admitted arsonist and had trafficked in drugs since age 13. Further, the judge believed that the defendant's long-term pattern of criminal convictions necessitated substantial discipline. The judge em-

phasized that while he realized the defendant did not pull the trigger, and may not even have been present when the robbery and killing took place, he was convinced that without the defendant's leadership in the conspiracy the robbery with its tragic consequence would never have taken place. The only reason that this robbery was planned and ultimately took place was because the defendant was pressuring his codefendants to pay him for drugs which they had purchased from him.

Further, the trial judge noted that although the guidelines did not apply in this case, offense variable number 2 for armed robbery in the sentence guidelines manual gave very great weight to the fact that a victim is killed in an armed robbery, even if homicide is not charged. Thus, there was no reason for the court not to weigh the fact that the victim of a conspiracy to commit armed robbery was killed, even though there was not a homicide charge or homicide conviction, and he imposed the same sentence of 60 to 200 years.

Although this Court has held this case in abeyance pending the decision in *People v Milbourn, Milbourn* has no application because the sentence guidelines do not include conspiracy and, thus, the defendant's minimum sentence cannot constitute a departure from the guidelines.

*People v Dumond,* Docket No. 83669: On November 1, 1985, the defendant, age 21, was convicted by a jury of conspiracy to commit armed robbery, armed robbery, and felony-firearm. On that date, the defendant was already in prison serving a sentence of 40 to 60 years for conspiracy to commit armed robbery. In that incident, which occurred 11 days after the instant offense, one of the victims was shot and severely injured.

The defendant and three other men gained en-

try into the home of a semiretired couple who lived on a farm. They forced them into a closet at gunpoint, ransacked the house, and took cash, credit cards, and heirlooms. Two of the defendants pled guilty and testified against the defendant at his jury trial, stating that the defendant had planned the robbery and carried the gun.

The defendant denied that he was the originator or that the gun was in view. He also emphasized that he had a serious substance abuse problem, reporting that he had begun using marijuana at 14, alcohol at 15, LSD at 17, and at present was heavily involved in drug sales, making approximately $2,000 a month on the sale of illicit substances. The victims testified that although they were not physically harmed they were very frightened and still had trauma over the incident. At sentencing, the judge noted the defendant's involvement in four prior felonies, one of which was an armed robbery in which a victim was shot.

The statute authorizes terms of life and a mandatory 2 years for felony-firearm. The guidelines minimum range for armed robbery was 5 to 8 years and under the 1988 revised guidelines is 5 to 25 years. The defendant was sentenced to two concurrent life terms and an additional 2 years for felony-firearm.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for a repeat armed robber is 8 years minus disciplinary credits, or 6 years, 5 months, and 26 days. If the 1988 guidelines govern, the sentence is 25 years minus disciplinary credits, or 20 years, 3 months and 27 days.

*People v Cummings,* Docket No. 82704: On April 4, 1986, the defendant, age 24, was convicted of armed robbery. The defendant admitted this of-

fense as well as two additional armed robberies, one committed two weeks previously, and the other on the following day.

The defendant has had problems with the law beginning when he was 10 years old. At age 11 he was placed in a foster home for incorrigibility. By 1979, at 16, the defendant had committed about 10 larcenies, as well as a breaking and entering of an occupied dwelling. The defendant is mildly retarded, found to suffer from depression, and has been diagnosed as psychotic. The defendant acknowledges he has problems with his temper and hears voices that tell him to kill somebody, but that he does not listen. The defendant also admits to an alcohol and a substance abuse problem.

The trial judge noted that the defendant has been in trouble since he was age 10 and had, in just a short time, built a very lengthy record for himself. He noted that the crimes had become progressively more serious, more threatening, and that the defendant had broken into a house fully aware that someone was home. The defendant's admittance that he felt like killing someone indicated to the judge that the minimum range was inadequate given the situation.

The statute authorizes life imprisonment. The guidelines minimum range was 18 to 36 months, and under the 1988 revised guidelines is 3 to 8 years. The defendant was sentenced to 20 to 30 years, and will serve approximately 16 years, 2 months, and 28 days.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for a person who commits three armed robberies within one week is 3 years minus disciplinary credits, or 2 years, 5 months, and 4 days. If the 1988 guidelines govern, the sentence is 8 years minus disciplinary credits, or 6 years, 5 months, and 26 days.

*People v Hawkins,* Docket No. 81703: On November 8, 1985, the defendant, age 20, was convicted by a jury of assault with intent to rob while armed and felony-firearm. He and another man robbed a gas station, and when the attendant began to run away the defendant told him to stop or he would blow his head off. He fired the gun, but the gun jammed and the bullet was not discharged.

The defendant did not have an official juvenile record, and as an adult was placed on pretrial diversion in 1984 as a result of a burglary offense. At sentencing, the judge noted that the fact that the gun jammed did not change the fact that the defendant intended to shoot the attendant. This fact made the crime much more serious and he believed that the sentence guidelines minimum range was simply inadequate.

The statute authorized a maximum penalty of life. The guidelines minimum range was 18 to 24 months and under the 1988 revised guidelines is 1 to 4 years. The judge sentenced the defendant to 18 to 30 years.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for assault with intent to commit armed robbery is 2 years minus disciplinary credits, or 1 year, 7 months and 12 days. If the 1988 guidelines govern, the sentence is 4 years minus disciplinary credits, or 3 years, 2 months and 24 days.

*People v Clardy,* Docket No. 84726: On June 16, 1986, the defendant, age 21, entered a guilty plea to a charge of breaking and entering of an unoccupied dwelling. The plea was given in exchange for the prosecutor's agreement not to pursue an habitual offender information, to reduce the charge from breaking and entering of an occupied dwell-

ing, and for the defendant's truthful testimony against codefendants.

The charge arose out of an incident in which the defendant and his friends went over to the home of people they had heard were out of state, kicked opened the door, and robbed the home. The sentencing hearing was originally scheduled for July 31, 1986. However, the defendant did not appear in court as scheduled, and as a result the court revoked the defendant's bond and ordered the issuance of a bench warrant. At the sentencing rehearing, the judge noted that the defendant appeared to need some structure in his life since he seemed unable to take responsibility for his action and be accountable to society; noting further the defendant's failure to appear at the originally scheduled sentencing hearing and his admitted use of controlled substances approximately two to three times a week.

On February 5, 1987, the defendant was sentenced to 6 to 10 years. The statute authorized a maximum penalty of 10 years, as opposed to 15 for the occupied dwelling offense, and the guidelines minimum range was 12 to 30 months. Under the 1988 revised guidelines it is 12 to 36 months, or 1 to 3 years.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for breaking and entering is 2 years, 6 months minus disciplinary credits, or 1 year, 7 months, and 12 days. If the 1988 guidelines govern, the sentence is 3 years minus disciplinary credits, or 2 years, 5 months, and 4 days.

*People v Smith*, Docket No. 85038: On June 13, 1986, the defendant, age 33, was convicted by a jury of armed robbery and felony-firearm.

The convictions arose out of an incident in

which the defendant and a female companion, wearing ski masks and carrying a shotgun, robbed a convenience store. The defendant held the shotgun to the clerk's head while the clerk emptied the cash register. After the clerk emptied the safe, she was told to go to the back of the store and lie down, and on the way to the back, the defendant discharged the gun into the air.

The defendant had some very serious prior misdemeanors on his record, although none were for assaultive offenses. Six of the misdemeanors dated back to 1971 when the defendant was 17 years old. The defendant had no prior felonies on his record. At sentencing, the trial court stated that the recommended guidelines in this case were totally unrealistic, specifying that there was an assault, and that the gun was not only loaded, but was also discharged. The sentence exceeded the guidelines because there was a need to protect society and to punish the offender; because of the emotional effect on the victim; and because a weapon was discharged during the commission of an armed robbery.

On July 21, 1986, the judge sentenced the defendant to 20 to 60 years. The statute authorized a maximum sentence of life. The guidelines minimum range was 24 to 48 months and under the 1988 revised guidelines is 24 to 72 months, or 2 to 6 years.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for this armed robbery is 4 years minus disciplinary credits, or 3 years, 2 months, and 24 days. If the 1988 guidelines govern, the sentence is 6 years minus disciplinary credits, or 4 years, 10 months and 12 days.

*People v Powell,* Docket No. 85747: On June 13,

1987, the defendant, age 18, was convicted by a jury of two counts of armed robbery and of felony-firearm.

The conviction arose out of an incident in which the defendant and an accomplice approached two women with a sawed-off rifle as they got out of their car in the parking lot of a bar. The men directed the driver to put her car keys in the ignition and start the car. After taking the driver's purse and necklace, the defendant got into the driver's seat, put the rifle next to him, and, with the other male in the back seat, drove away. The defendant was apprehended two days later driving the stolen car and subsequently identified by one of the victims in a police lineup.

The defendant had no prior record. However, at the time of this conviction he had a pending warrant for possession of a rifle and receiving stolen property over one hundred dollars. At sentencing, the judge stated that under the circumstances, the guidelines were inadequate. While the statute authorized life imprisonment for two armed robberies involving two victims, the minimum range under the guidelines was only 36 to 72 months. Under the 1988 revised guidelines, the maximum minimum is sixty months.

Powell was sentenced to two concurrent terms with a minimum sentence of twenty years.

*People v Haymer,* Docket No. 85824: The defendant, age 17, pled guilty of one count of robbery armed. The plea bargain involved the dismissal of one count of attempted breaking and entering, and one count of breaking and entering.

These offenses arose out of an attempt by the defendant and his uncle to break into a gas station/party store. While the defendant was using a crowbar to break into the building, the victims, a

man and woman, drove past the building, witnessed the activity, stopped and chased the defendant and his uncle around the building. The uncle pointed a gun at the man, and the defendant, holding the crowbar, directed the woman to lie on the ground, and then took a purse and the keys from the car.

The defendant had committed six crimes as a juvenile, including unlawful use of a credit card, two counts of larceny from a building, breaking and entering an unoccupied dwelling, and probation violation.

As an adult, the defendant was convicted of breaking and entering an occupied dwelling. While on bond for that offense, the defendant committed the instant offense and two armed robbery offenses.

At the time of his conviction, the defendant was a senior in high school. He admitted to being suspended for fighting with students and teachers. The defendant also admitted that he had never held a job, that he made most of his money by gambling, and that his problem is that he does not think of the consequences of things he does until he has done them.

It should also be noted that the defendant had had a very difficult time adjusting to incarceration and was transported to a higher level security institution as a result. While at the Michigan Reformatory, he was placed in segregation because he was considered a threat to the staff and other residents.

The presentence report contained information regarding twenty-seven of his major misconduct offenses which included destruction of property, possession of a dangerous weapon, a sixteen-inch sharpened steel rod, assault and battery of another inmate, and disobedience of direct orders.

The statute authorized a maximum sentence of life imprisonment. For purposes of scoring, the guidelines do not consider any other adult convictions for this defendant because all of his convictions occurred subsequent to the commission of the instant offense. Therefore, because of the defendant's extensive involvement in criminal activity and his particular involvement in armed robberies, a departure from the guidelines was warranted.

Under the guidelines, the maximum minimum sentence was 8 years; and under the revised guidelines it is 8 years. The defendant was sentenced to a minimum term of 30 years.

*People v Long,* Docket No. 85609: The defendant, age 21, pled guilty of armed robbery and during the course of the plea, confessed to six or seven robberies in total. As part of the agreement, the defendant was not charged with those robberies.

This offense arose out of a robbery of a television store, and the victims, the owner of the store and his wife, stated that the defendant and his accomplice held them at gunpoint, tied them up, and then emptied the cash register and stole a television set and a VCR. Another offense with which the defendant was charged was committed the following month and involved the robbery of a gas station.

The victims of the store robbery stated that the incident has had a significant psychological and emotional effect on them. The victim of the gas station robbery stated she suffers from severe psychological and emotional harm and has been unable to work since the robbery.

The defendant listed among his weaknesses a long and persistent abuse of substances which include valium, marijuana, cocaine, and alcohol. The defendant's behavior in the present offenses

indicated an individual who is prone to violence, and his illicit use of controlled substances has contributed significantly to his deviant behavior.

At sentencing, the judge noted that he had to consider the defendant's substantial substance abuse problem, and that the defendant quit his job in order to live on the streets, i.e., to live a life of crime. Further, he noted that the sentencing guidelines do not take factors important in this case into consideration: the need for extensive rehabilitation, extensive drug treatment, extensive counseling, and the severe emotional and psychological damage to the victims of defendant's crimes.

The statute authorized life imprisonment. Under the guidelines, the maximum minimum sentence was six years, and under the revised guidelines is six years. The sentence imposed included a minimum sentence of twenty years.

### LARCENY AND MALICIOUS DESTRUCTION OF PROPERTY

*People v Salski,* Docket No. 83678: On March 7, 1986, the defendant, age 20, was sentenced for the offenses of larceny over $100, malicious destruction of property over $100, and larceny by false pretenses over $100.

The defendant's contacts with the juvenile system began at age 13, and by the time he was 15 or 16 years old, it appears he was basically out of control. From this time on, he has lived on the streets and has become heavily involved in the use of drugs, in particular, the use of LSD.

Psychological testing indicates the defendant has a full-scale IQ of 76. He relates that his consumption of alcohol, marijuana and LSD increased to a point in June, 1985, where he was "too wasted" to go on. During that time he experienced hallucina-

tions, dizziness, blackouts, and problems with balance and vision. The defendant claims he stopped immediately after that but that he did consume considerable amounts of alcohol prior to confinement in jail.

Although the defendant has been involved in a rash of offenses, he has never been confined for any length of time. The defendant's record includes 7 misdemeanors, including shoplifting, disorderly conduct, disturbing the peace, assault and battery, and possession of marijuana. The presentence report indicated that until the defendant was actually incarcerated for the present offense, the seriousness of his behavior had never dawned upon him.

The defendant was sentenced to 5 years probation for larceny. The following month the defendant was sentenced by a different judge for larceny by false pretenses and malicious destruction of property. The statute authorized a maximum penalty of 10 years for the larceny by false pretenses conviction, and 4 years for the destruction of property offense.

The guidelines minimum range was 0 to 12 months for both larceny and malicious destruction of property, and under the 1988 revised guidelines is the same. The judge sentenced the defendant to 80 to 120 months for the larceny and 32 to 48 months for the malicious destruction of property.

Using the maximum minimum under the guidelines, the mandatory minimum sentence for this offender is 1 year minus disciplinary credits, or 9 months and 21 days.

ARSON

*People v Lawrence,* Docket No. 81954: On November 10, 1986, the defendant, age 25, pled guilty of

preparation to burn real property over $50 and received a 13 month to 4 year sentence.

The instant offense involved the defendant getting into a fight with his brother and then, afterwards, setting fire to the brother's bed. The defendant did try to put it out immediately and called the fire department. The presentence report related that the defendant's past AWOL record from the service indicated he would not be a good candidate for probation.

At sentencing, the judge stated that the guidelines did not reflect the seriousness of the crime because the fire was started in an apartment building, endangering other tenants, and the fact that fire department personnel were put into action created an added danger to the public.

The statute authorized a maximum penalty of 4 years. The guidelines minimum range was 0 to 3 months and under the 1988 revised guidelines is 1 to 10 months. Using the maximum minumum under the 1984 guidelines, the mandatory minimum sentence for this offender is 3 months. If the 1988 guidelines govern, the sentence is 10 months minus disciplinary credits, or 7 months and 30 days.

The judge sentenced the defendant to a term of 13 months to 4 years. The defendant was paroled on September 22, 1987 and discharged from parole on March 22, 1989.

DRUG OFFENSE

*People v Finley,* Docket No. 83310: The defendant, age 37, pled guilty of delivery of less than fifty grams of cocaine. MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv). He sold a detective 2.91 grams of cocaine for $340.

The defendant's previous record includes two

marijuana offenses, one misdemeanor, and one felony. The statute authorized a maximum penalty of 20 years. The guidelines minimum range was 30 to 42 months and under the 1988 revised guidelines 0 to 12 months. The judge sentenced the defendant to a term of 10 to 20 years.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for this offender is 3 years, 6 months, minus disciplinary credits, or 2 years, 9 months, and 29 days. If the 1988 guidelines govern, the sentence is 1 year minus disciplinary credits, or 9 months, and 21 days.

*People v Johnson,* Docket No. 84777: On April 27, 1987, the defendant, age 29, pled guilty of delivery of less than 50 grams of a controlled substance. In exchange for her plea, another drug charge was dismissed, and she was placed on probation for up to 3 years with the proviso that she spend the first and the last 180 days in jail. Due to prison overcrowding, the defendant was permitted to participate in an electronic surveillance program. She admitted violating probation by breaking curfew and later was convicted of attempting to issue a no-account check while on probation.

The sentencing hearing was held on September 17, 1987, at which time the judge expressed his frustration that the defendant had not taken the opportunity to rehabilitate and do something about her drug problem. At this time, the sentencing guidelines did not apply to probation violations. The trial judge sentenced the defendant to 10 to 20 years.

In affirming the lower court decision, the Court of Appeals noted that since the guidelines were inapplicable, it could not be contended that the trial court insufficiently articulated its reasons for

departing from them. The only way in which a reviewing court would remand for resentencing in this case would be if the sentence imposed by the trial court indicated an abuse of discretion of such magnitude as to shock the conscience of the court.

While the guidelines do not address probation violations, the statute authorized 20 years for the drug offense and the guidelines minimum range was 6 to 12 months. Under the 1988 guidelines, it is 12 to 24 months.

Using the maximum minimum under the 1984 guidelines, the mandatory minimum sentence for a repeat drug offender is 1 year minus disciplinary credits, or 9 months and 21 days. If the 1988 guidelines govern, the sentence is 2 years minus disciplinary credits, or 1 year, 7 months, and 12 days.

*People v Kurtz,* Docket No. 85049: On September 1, 1987, the defendant, age 32, pled guilty of two counts of delivery of less than 50 grams of cocaine in exchange for a dismissal of an additional count of conspiracy with her husband to deliver the drugs.

At the sentencing hearing held on October 22, 1987, the judge explained the sentence imposed, 5 to 20 years, in detail. He noted that there were concurrent offenses for delivery, something the guidelines did not take into account, and that it makes a difference whether there is intent to deliver, noting that the defendant first claimed she was not a user. Further, he noted that cocaine has a serious effect on both society and on the individual, that the courts have a responsibility to try and deter people from selling drugs, and concluded that it was in the best interest of society to impose heavy sentences for the sale of cocaine.

The maximum term authorized under the stat-

ute is 20 years. The maximum minimum term authorized under the 1984 guidelines was 3 years and 6 months, and under the 1988 revised guidelines is 1 year.

Kurtz was sentenced to a minimum term of 5 years.

*People v Melendez,* Docket No. 85458: On February 11, 1987, the defendant, age 39, was convicted by a jury of possession with intent to deliver more than 225 grams but less than 650 grams of cocaine.

The presentence report contained information that, prior to the defendant's arrest in Lansing on October 1, 1986, for the present offense, he only had been to Michigan twice. The defendant first came under surveillance because he was suspected of transporting drugs between Cuba and Miami and was a prime suspect in the murders of two drug dealers who had operated a drug house in Lansing. The prosecutor recommended a maximum prison term in part on the basis of the defendant's unwillingness to coöperate with the authorities and the quantity of cocaine involved.

The statute authorized a maximum penalty of 20 years. Under the 1984 guidelines, the maximum-minimum sentence was 1 year, and under the 1988 guidelines, it is 2 years. The trial court sentenced the defendant to a minimum term of 15 years, stating that the reasons for the departure from the guidelines were that the defendant was a professional drug dealer, a large amount of drugs was involved, and that society was entitled to maximum protection from such people.